Argued March 21; affirmed December 23, 1930; rehearing denied
January 13, 1931

ELLIOTT ET AL. *v.* CITY OF EUGENE ET AL.

(294 P. 358)

*H. E. Slattery,* of Eugene, for appellants.

*S. M. Calkins* and *W. W. Calkins,* both of Eugene,
for respondents.

ROSSMAN, J. Briefly stated the complaint alleges that on April 8, 1928, the City Council of the City of Eugene enacted Ordinance No. 6780, the preamble of which recites that garbage is being hauled over the city streets by a number of persons having "insufficient, unsanitary, and poor equipment, which equipment is not kept in a sanitary condition;" that "the streets of the city of Eugene are being continually littered with leaking garbage, and garbage is being disposed of in all sorts of unauthorized and out of the way places in the city, which the city is being obliged to again take up;" that the city found it impossible to properly regulate the removal of garbage under present circumstances; that it finally concluded that the handling of garbage should be confined to "one responsible contractor;" and that after advertising for bids found that the bid of Bray Brothers was the best obtainable. The Ordinance provided (1) that a contract should be executed granting to Bray Brothers for the period of three years the privilege of collecting all garbage in the city according to the terms of a contract attached to the Ordinance; (2) that Bray Brothers should deposit with the city a bond assuring their faithful performance of the contract; (3) that Bray Brothers should pay a "regulation and inspection fee" of $900, and that the city sanitary inspector should at least once a week inspect all their equipment and their dumping ground; (4) that "it shall be unlawful in the City of Eugene for any person, firm or corporation to haul garbage, rubbish or refuse for hire unless they shall have first entered into a contract with the City of Eugene for such service, it being the intention of this provision to make the attached contract with Bray Brothers an exclusive contract * * *;"

(5) that all persons be prohibited from permitting garbage to accumulate upon their premises and (6) that all violations of the ordinance be punished with a penalty prescribed by this section of the ordinance.

Annexed to the aforementioned ordinance was a contract dated April 10, 1928, executed by the City as first party and the Bray Brothers as second parties; its stipulations were in harmony with the provisions of the ordinance. It contained a recital "that the first party does hereby grant unto the second parties the exclusive right, franchise, and privilege of collecting, gathering and hauling over the streets of the city of Eugene, Oregon, all garbage * * * with the right to exact charges * * * for the term of three years from and after April 1, 1928." After specifying the fees which the Bray Brothers were authorized to charge for their services it required them to furnish "a suitable garbage depository" and keep it in a sanitary condition; "to maintain from the City to their garbage ground a suitable roadway in such condition that vehicles of all sorts can readily pass to and fro thereon;" to "rake and keep clean the alleys in cooperation with all residents;" to provide themselves with adequate equipment constructed in a manner as defined in the contract; to establish an office suitably located, and to sterilize their trucks with steam once each day. The contract also prescribed how frequently the Bray Brothers should collect garbage; it excluded their equipment from the streets at specified hours of the day and provided that householders could deliver to their depository small quantities of refuse originating upon their own premises.

Continuing the complaint alleges that November 13, 1928, the City amended the above ordinance by enact-

ing Ordinance No. 7177, which defined with greater particularity the hauling of garbage for hire mentioned in section 4 or Ordinance No. 6780 by enacting that "any person, firm or corporation hauling garbage, refuse or rubbish not produced by himself shall be deemed to be hauling for hire." Next the complaint alleges that May 27, 1929, at a municipal election the charter of the city was amended by adding the following:

"Section 1. That the City of Eugene, Oregon, never shall grant to any person, firm, or corporation a monopoly to haul garbage, rubbish or refuse within the City of Eugene, Oregon, or along or over the streets of the said city for hire, or otherwise; and that all citizens of the said city shall have the right to remove garbage, rubbish and refuse from the said city for hire or otherwise; and that any resident of the said city shall have the right to employ such person as he may desire to haul his garbage, rubbish or refuse.

"Section 2. That the Common Council shall have the power to enact reasonable measures for the sanitary removal of garbage, rubbish, and refuse; but the said measures shall apply to all alike.

"Section 3. That all parts of the Charter and Ordinances of the said city which conflict with this act are hereby repealed."

Further the complaint alleges that the plaintiffs keep some livestock upon their farms outside of the municipality's boundaries, and purchase in the city "garbage consisting of vegetable matter and other matter of stock food value which accumulates daily within the city;" that they haul it from time to time from the producers to their farms; and that the privilege of obtaining this garbage is a valuable one. After alleging that the defendants have threatened to arrest the plaintiffs on account of the acts just mentioned

the complaint prays for an order restraining them from so doing. As previously stated the defendants demurred to the complaint. The only issue before us, therefore, is whether the above facts entitle the plaintiffs to relief.

The strict rules of statutory construction, often invoked when a monopoly is claimed, need no consideration here because the plantiffs freely concede that the two ordinances conferred upon the Bray Brothers the monopoly of collecting for hire all garbage in the city of Eugene, and also concede that the subsequent charter amendment is hostile to the two ordinances. We quote, for instance, from appellants' brief, "the common council gave unto Bray Brothers the exclusive right to haul garbage in Eugene, Oregon, for a period of three years * * *. There is not the slightest question but what the charter amendment, a copy of which is set forth above, does violate, repudiate, breach and ignore the contract with Bray Brothers. The two instruments cannot stand together." The plaintiffs do not assail the validity of the two ordinances. Very recently this court sustained an ordinance of the city of Medford substantially similar to the one now before us: *Spencer v. City of Medford,* 129 Or. 333 (276 P. 1114).

Having conceded that the charter amendment "does violate, repudiate, breach and ignore" the ordinance, which granted to Bray Brothers a three-year exclusive privilege to collect all garbage in the city, the plaintiffs seek to show that there is no conflict between the effect produced by the charter amendment and art. I, section 10 of the Federal Constitution, which prohibits legislation "impairing the obligation of contracts," by contending that a repudiation of a contract is not an

impairment thereof. They cite many cases in support of their argument of which *Lord v. Thomas,* 64 N. Y. 107 and *Caldwell v. Donaghey,* 108 Ark. 60 (156 S. W. 839, 45 L. R. A. (N. S.) 721, Ann. Cas. 1915B, 133) are good examples. The contracts involved in both of those cases required the construction of public buildings. Subsequent legislation disavowed the state's intention to proceed; or, to use the layman's language, it attempted to "break the contract." Both courts held that these subsequent legislative acts constituted a breach of the contract as distinguished from an impairment of it.

But it seems to us that a very important distinction exists between the facts of our case and those cases. All of the decisions upon which the plaintiffs rely involved pure contracts in which the state lent to the other party none of the privileges of the sovereign, whereas, in the present situation the city of Eugene, when it subscribed to the contract with the Bray Brothers, conferred upon them special privileges which only a sovereign could exercise as a matter of right. That being true the defendants contend that the contract was really a franchise. Chief Justice Taney's definition of the word "franchise" has been much employed. He pointed out that franchises are special privileges conferred by the government on individuals, and which do not belong to the citizens of the country generally of common right. See Joyce on Franchises, § 2. See also 12 R. C. L., Franchises, § 1, p. 174. We believe that the two ordinances conferred upon the Bray Brothers a franchise. They permitted the latter to haul the entire garbage of the city through the public streets of Eugene. The hauling of garbage is everywhere regarded as peculiarly subject to the police power of the state.

■ This franchise was an exclusive one and conferred upon the Bray Brothers a monopoly. In the latter sense a feature is present in this case similar to that in the Louisiana Slaughter House Cases, 16 Wall. 36 (21 L. Ed. 394), upon which the appellants rely. The Slaughter House Cases should be read in connection with *New Orleans Gas Light Co. v. Louisiana Light, etc., Co.*, 115 U. S. 650 (6 S. Ct. 252, 29 L. Ed. 516). For a review of those cases we rely upon the succinct statement of Professor Freund, Police Power, § 680:

"The Louisiana slaughter-house and gas company cases show some fluctuation or modification of opinion on the part of the Supreme Court. The slaughter-house cases sanction a monopoly for the protection of the public health, the Butchers' Union case [111 U. S. 746] holds such a monopoly to be revocable, the gas company cases sustain the irrevocability of a gas monopoly. The slaughter-house cases go on the broad ground that the Fourteenth Amendment affords no protection against monopolies, the Butchers' Union case upon the ground that the legislature cannot bargain away its power to protect public health or morals, the gas company cases on the ground that the supply of gas is a public business and involves the grant of franchises which in their nature cannot be of common right. The slaughter-house cases do not suggest that a monopoly against common right cannot be irrevocably granted for a definite period, and the grant there was for a period of twenty-five years. The Butchers' Union case says that a wise policy forbids the legislative body to divest itself of the power to enact laws for the preservation of health. Had the slaughter-house monopoly endangered the public health, or had the public health required additional slaughter-house facilities not furnished by the monopoly, a case would have been presented within the principle of [Boston] *Beer Co. v. Massachusetts* [97 U. S. 25] and *Stone v. Mississippi* [101 U. S. 814]. But it was not charged, nor does the opinion of the Supreme Court intimate, that the con-

tinuation of the monopoly was inconsistent with the public health. The abrogation of the monopoly was an economic and not a sanitary measure. The decision of the Supreme Court means, therefore, that while a monopoly against common right can be granted for police purposes, the Supreme Court will not recognize such a monopoly as a contract, i. e., it is intrinsically revocable, no matter whether the revocation be demanded by the public health or not. This seems an important modification of the slaughter-house cases, which do not suggest any distinction between a slaughter-house and a bridge monopoly. On the other hand, where the monopoly is not against common right, but relates to a public franchise, it may be made exclusive so that subsequent competing grants cannot be made, and this constitutes a contract. Such a contract is subject to further regulations in the interest of health or safety, but its total abrogation by the grant of competing rights would, it seems, not even be justified by regard for the public health or safety, requiring a different or additional supply of light; the abrogation even for that purpose could be accomplished only by the exercise of the power of eminent domain.''

Hauling garbage through the public streets, especially by such individuals as the plaintiffs who did not produce it, cannot be considered as a common right: *Spencer v. City of Medford,* supra. Hence, the monopoly which the plaintiffs challenge was not one against common right. We, therefore, have an exclusive franchise which permitted the plaintiffs to charge fees and required them to make a substantial investment for equipment. The charter amendment, which attempted to provide competing grants, was not intended as a regulatory measure. This is evident not only from the language of the charter amendment, but also from the language of the brief of the plaintiffs.

■■  The above being the circumstances it is impossible to construe the charter amendment as anything but an effort to impair the contract between the Bray Brothers and the City of Eugene. It has been held so many times that the state cannot impair a franchise in violation of the aforementioned constitutional provision that it seems unnecessary to cite authorities. See, however, 6 R. C. L., Constitutional Law, § 333, p. 340 and 26 C. J., Franchises, § 78, p. 1035. In the aforementioned case of *New Orleans Gas Light Co. v. Louisiana Light, etc., Co.,* the Federal Supreme Court held that even a change in the constitution of the state could not impair the franchise. It necessarily follows, therefore, that the charter amendment was ineffective to repeal Ordinances No. 6780 and 7177. Since these ordinances have not been repealed they are still in effect, and hence the circuit court properly sustained the demurrer to the complaint. Although we have reached the above conclusions, we find no occasion for withholding legal significance to the charter amendment at the conclusion of the Bray Brothers' contract.

It follows from the above that the decree of the circuit court will be sustained.

KELLY, J., did not participate in this opinion.

COSHOW, C. J., and RAND, J., concur.