Argued and submitted January 14, 2013, reversed and remanded July 2, petitions for review allowed November 20, 2014 (356 Or 516)

NORTHWEST NATURAL GAS COMPANY,
an Oregon corporation;
and Portland General Electric Company,
an Oregon corporation,
*Plaintiffs-Respondents,*
*and*

ROCKWOOD WATER
PEOPLE'S UTILITY DISTRICT,
*Intervenor-Respondent,*

*v.*

CITY OF GRESHAM,
a municipality and public body
within the state of Oregon,
*Defendant-Appellant.*

Multnomah County Circuit Court
110708422; A150990

330 P3d 65

David R. Ris argued the cause and filed the briefs for appellant.

Jeffrey G. Condit argued the cause for respondents Northwest Natural Gas Company and Portland General

Electric Company. With him on the brief was Miller Nash LLP.

Casey M. Nokes argued the cause for respondent Rockwood Water People's Utility District. With him on the brief were Clark I. Balfour, Jon W. Monson, and Cable Huston Benedict Haagensen & Lloyd LLP.

Before Armstrong, Presiding Judge, and Hadlock, Judge, and Egan, Judge.

ARMSTRONG, P. J.

## ARMSTRONG, P. J.

Plaintiffs Northwest Natural Gas, Portland General Electric, and Rockwood Water People's Utility District brought this declaratory relief action challenging a City of Gresham resolution that increased plaintiffs' utility-license fees from five percent to seven percent of the gross revenue that plaintiffs receive from their Gresham operations. Plaintiffs contended that the city could not impose the increased fee because ORS 221.450 preempted the city's authority to charge a fee of more than five percent. The city responded that the statute did not apply because the ordinance imposed a utility-license fee and not a "privilege tax," as the latter term is used in ORS 221.450. On cross-motions for summary judgment, the trial court concluded that the statute did apply and declared the city's resolution void and unenforceable. On appeal, we conclude that the city's fee increase was not preempted by ORS 221.450 because plaintiffs are not operating "without a franchise from the city," which is a condition that must be met for the statute to apply. Accordingly, we reverse and remand.

The case was litigated below on stipulated facts and exhibits, from which we relate the following. The city is a home-rule municipality, which, under its charter, "has all powers [that] the constitution, statutes, and common law of the United States and of this state expressly and impliedly grant or allow municipalities as fully as though this charter specifically enumerated each of those powers." Gresham Charter of 1978, ch II, § 5.

In 2001, the city enacted ordinances 1523 and 1524, which established the city's Utility Licensing Ordinance. *See* City of Gresham Revised Code (GRC), arts 6.30, 6.35. The city's stated purposes for the ordinance are, among other things, to permit and regulate reasonable access to the public rights-of-way by entities providing utility services in the city and to assure that the city is fairly and reasonably compensated for permitting that use. GRC 6.30.020. All public and private utilities operating within the city that occupy the public rights-of-way are required to obtain a license from the city, and, unless otherwise specified, a license has a term of 10 years. GRC 6.30.070. The ordinance

also sets out the terms under which a utility may operate in the public rights-of-way, including terms regulating the location, construction, relocation, and removal of utility facilities; requiring permits and fees for work in the rights-of-way; and covering other general regulatory matters, such as indemnity, mapping, and enforcement. *See generally* GRC arts 6.30, 6.35.

Under the ordinance, each utility licensee must pay a license fee:

> "Each license granted pursuant to this article shall be subject to the condition that the licensee pays a license fee in an amount or by a method or methods established from time to time by council resolution[,] which may include payment of a minimum license fee. The city may elect in the resolution establishing the license fee to dedicate all or a portion of the license fee to specific funds, projects or programs of the city."

GRC 6.30.110(1)(a). In accordance with that provision, the city passed a resolution in 2001 establishing a utility-license fee of five percent of utility gross revenues, but it exempted city-owned and special-district-owned utilities from paying the fee. By resolutions passed in 2002 and 2003, the city made the five percent fee applicable to user fees collected by city-owned utilities and Rockwood.

The city passed the resolution at issue in this case in 2011. That resolution increased the utility-license fee from five percent to seven percent. Before imposing the fee, the city notified plaintiffs of the increase and told them that the city had increased the fee "[t]o avoid further service reductions in the police and fire departments."

Plaintiffs, all of which were operating under licenses from the city, brought this action challenging the city's authority to increase the utility-license fee from five to seven percent. Plaintiffs argued that the city's resolution is void because ORS 221.450 limits the city to charging a maximum fee of five percent.[1] Rockwood also argued, in the alternative,

---

[1] ORS 221.450 provides, as relevant:

"[T]he city council or other governing body of every incorporated city may levy and collect a privilege tax from Oregon Community Power and from every electric cooperative, people's utility district, privately owned public

that the city could not charge its increased fee against Rockwood because, as a municipal corporation, Rockwood cannot be taxed by the city without express state authorization to do that.

On the parties' cross-motions for summary judgment, the trial court agreed with plaintiffs that the city's fee increase was preempted by ORS 221.450, and, consequently, the court did not reach Rockwood's alternate argument. In a lengthy letter opinion, the court concluded that the city's utility-license fee was a privilege tax under ORS 221.450, and, accordingly, the city was prohibited from charging more than the five percent tax authorized under that statute.

The court then entered a general declaratory judgment for plaintiffs, as follows:

"1. With respect to Plaintiffs' claims for declaratory relief, the Court declares that (i) Defendant City of Gresham's Utility License Fee is a privilege tax within the meaning of ORS 221.450; and (ii) the City of Gresham's Resolution 3056, to the extent it purports to increase its Utility License Fee owed by Plaintiffs from 5% to 7% of gross revenue, violates ORS 221.450 and is void, unlawful, and unenforceable;

"2. The Court dismisses Defendant City of Gresham's claims for declaratory relief and costs with prejudice; and

"3. The Court awards Plaintiffs their costs and disbursements in an amount to be determined by supplemental judgment in accordance with ORCP 68."

The city appeals the general judgment and assigns as error both the grant of plaintiffs' motions for summary judgment and the denial of its motion for summary judgment.[2]

---

utility, telecommunications carrier as defined in ORS 133.721 or heating company. The privilege tax may be collected only if the entity is operating for a period of 30 days within the city without a franchise from the city and actually using the streets, alleys or highways, or all of them, in such city for other than travel on such streets or highways. The privilege tax shall be for the use of those public streets, alleys or highways, or all of them, in such city in an amount not exceeding five percent of the gross revenues of the cooperative, utility, district or company currently earned within the boundary of the city."

[2] As the judgment reflects, the city sought a declaration on the validity of the city's fee, which the judgment identifies as a claim that the court dismissed. Apart from the conclusion that the court erred in entering the declaratory judgment that it did, we note that dismissal of the city's claim for declaratory relief

"In an appeal from a judgment that results from cross-motions for summary judgment, if both the granting of one motion and the denial of the other are assigned as error, then both are subject to review." *Eden Gate, Inc. v. D&L Excavating & Trucking, Inc.*, 178 Or App 610, 622, 37 P3d 233 (2002). Because there are no disputed issues of material fact, we must determine whether any moving party is entitled to judgment as a matter of law. ORCP 47 C.

When reviewing the validity of an enactment by a home-rule municipality, such as the city, we follow the methodology set out in *LaGrande/Astoria v. PERB*, 281 Or 137, 142, 576 P2d 1204, *adh'd to on recons*, 284 Or 173, 586 P2d 765 (1978). In *LaGrande/Astoria*, the Oregon Supreme Court held that "the validity of local action depends, first, on whether it is authorized by the local charter or by a statute ***; second, on whether it contravenes state or federal law." *See also AT&T Communications v. City of Eugene*, 177 Or App 379, 389, 35 P3d 1029 (2001), *rev den*, 334 Or 491 (2002) ("Whether a city has the authority to impose a tax *** depends on two issues: First, whether the charter of the city confers the authority to impose the tax; and second, whether that authority has been preempted by state or federal law."). Here, plaintiffs do not dispute that the city could enact its resolution and impose its increased fee pursuant to the broad, general powers granted to the city by its home-rule charter.[3] What all plaintiffs argued—and what was the basis for the trial court's decision below—was that the city's fee increase contravened ORS 221.450, *viz.*, that the resolution was preempted by state law under the second analytical step in *LaGrande/Astoria*.

---

was not a proper disposition of it. *See, e.g., Rood v. Coos County*, 240 Or App 68, 72 n 3, 246 P3d 69 (2010), *rev den*, 351 Or 541 (2012).

[3] On appeal, Rockwood does dispute that that principle applies to the city's authority to impose a fee against people's utility districts, such as Rockwood, and does so by reprising its alternative argument that the trial court did not reach. Essentially, Rockwood contends that, because Rockwood is a municipal corporation, the city must have a specific and express statutory grant of authority to impose a fee against it. We recently rejected the identical argument in *Rogue Valley Sewer Services v. City of Phoenix*, 262 Or App 183, 190-91, 329 P3d 1 (2014), concluding that a city's home-rule authority to impose taxes or fees on a utility is not affected by the utility's status as a municipal corporation. Accordingly, we reject Rockwood's alternative argument without further discussion.

The court explained in *LaGrande/Astoria* that, in determining whether a local law is preempted by state or federal law, "the first inquiry must be whether the local rule in truth is incompatible with the legislative policy, either because both cannot operate concurrently or because the legislature meant its law to be exclusive." 281 Or at 148. In making that determination, we are required to interpret the local enactment, "if possible, to be intended to function consistently with state laws." *Id.* We recently emphasized that "we will not determine a local ordinance to be preempted by implication—the legislature's preemptive intention must be apparent—that is, 'clear and unequivocal'—or the concurrent operation of the local and state law must be impossible." *Rogue Valley Sewer Services v. City of Phoenix*, 262 Or App 183, 192, 329 P3d 1 (2014). Accordingly, the parties' arguments require us to determine the intention of the legislature in enacting ORS 221.450, and, thus, we look to the text of that statute in context, along with any legislative history that is useful to our analysis. *See State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

A brief discussion of the historical development of ORS 221.450, as well as of ORS 221.420, is a useful starting point. In 1911, in what would eventually become ORS 221.420, the legislature enacted a statute that expressly gave municipalities the power to regulate utilities. *See* Or Laws 1911, ch 279, § 61. In 1931, the legislature amended the utility-regulation statutes, including the predecessor to ORS 221.420. *See* Or Laws 1931, ch 103. The 1931 version of the predecessor to ORS 221.420 provided, as relevant:

> "Every city and town in Oregon shall have power: * * * To determine by contract or prescribe by ordinance or otherwise, the quality and character of each kind of product or service to be furnished or rendered by any public utility, furnishing any product or service within such city or town, and all other terms and conditions upon which any public utility may be permitted to occupy the streets, highways or other public property within such city or town, and to exclude or eject any public utility therefrom."

Or Laws 1931, ch 103, § 8. In its current form, ORS 221.420 continues to provide that cities have the power to "[d]etermine by contract or prescribe by ordinance or otherwise,

the terms and conditions, including payment of charges and fees, upon which any public utility *** may be permitted to occupy the streets, highways or other public property within such city." ORS 221.420(2)(a). *See also Springfield Utility Board v. Emerald PUD*, 339 Or 631, 641, 125 P3d 740 (2005) ("[A]lthough it has evolved over time, [ORS 221.420] consistently has conferred cities with affirmative statutory authority to regulate utilities within their boundaries.").

Also in 1931, by a separate bill, the legislature enacted the predecessor to ORS 221.450. *See* Or Laws 1931, ch 234, § 1. That version of the statute provided, as relevant:

> "The city council or other governing body of every incorporated city and town in Oregon hereby is authorized to levy and collect from every privately owned public utility operating within such city or town without a franchise, for the period of one year, a privilege tax for the use of the public streets, alleys and highways in such city or town, in an amount of not less than 5 per cent annually, of the gross earning revenue of such utility currently earned within the boundary of such city or town."

The legislature amended that statute in 1933 in both its regular and second special sessions to reduce from one year to 30 days the period in which a utility that operates without a franchise becomes subject to the statute, and to change the five percent tax from a floor to a ceiling. Or Laws 1933, ch 466, § 1; Or Laws 1933, ch 24, § 1 (2d Spec Sess). Following those amendments, the statute provided:

> "The city council or other governing body of every incorporated city and town in Oregon hereby is authorized to levy and collect from every privately owned public utility operating for a period of 30 days within such city or town without a franchise from such city or town and actually using the streets, alleys and/or highways in such city or town for other than travel on such streets or highways, a privilege tax for the use of said public streets, alleys and/or highways in such city or town in an amount not exceeding five per cent of the gross revenues of such utility concurrently earned within the boundary of such city or town ***."

Or Laws 1933, ch 24, § 1 (2d Spec Sess). Since 1933, the statute has undergone further minor amendments, and now provides, as relevant:

"[T]he city council or other governing body of every incorporated city may levy and collect a privilege tax from Oregon Community Power and from every electric cooperative, people's utility district, privately owned public utility, telecommunications carrier as defined in ORS 133.721 or heating company. The privilege tax may be collected only if the entity is operating for a period of 30 days within the city without a franchise from the city and actually using the streets, alleys or highways, or all of them, in such city for other than travel on such streets or highways. The privilege tax shall be for the use of those public streets, alleys or highways, or all of them, in such city in an amount not exceeding five percent of the gross revenues of the cooperative, utility, district or company currently earned within the boundary of the city."

ORS 221.450. Although ORS 221.450 has evolved over time, it consistently has applied only to utilities operating "without a franchise."[4]

The parties appear to have assumed in this litigation that a license granted to a utility under the city's Utility Licensing Ordinance is not a "franchise" and, thus, that plaintiffs are operating "without a franchise from the city" for purposes of ORS 221.450. The parties' arguments on appeal, as below, focused on whether the city's fee is a "privilege tax" limited by ORS 221.450 to five percent of the utilities' respective gross revenues. Because we have an independent duty to correctly construe and apply statutes,

---

[4] We recognize that the current version of ORS 221.450 differs somewhat from the earlier versions. In 2007, the legislature split the pertinent text of the statute, which was previously a single, run-on sentence, into three separate sentences, which, with proper grammar, required additional minor changes to the text. *See* Or Laws 2007, ch 807, § 41. The 2007 amendment was part of the Senate amendments to the bill that created the Oregon Community Power statutes. *See* Senate Amendments to Senate Bill 443, Committee on Business, Transportation, and Workforce Development (May 21, 2007). The Senate amendments to ORS 221.450 were enacted without explanation or comment in the legislative history and, based on the bill as a whole, appear to have been made solely to include Oregon Community Power as a listed utility. "The fact that the legislature altered the wording of a statute does not always mean that it intended to alter the substantive effect of the statute." *Pete's Mountain Homeowners v. Ore. Water Resources*, 236 Or App 507, 521, 238 P3d 395 (2010); *see also Jones v. General Motors Corp.*, 325 Or 404, 419, 939 P2d 608 (1997) (legislative alteration of the wording of ORCP 47 did not alter the substantive effect of the rule). Based on our review of the text of the 2007 changes, in context, along with the legislative history of the bill enacting them, we conclude that the legislature did not intend to alter the substantive effect of the statute.

*see, e.g., Stull v. Hoke*, 326 Or 72, 77, 948 P2d 722 (1997) ("In construing a statute, [an Oregon] court is responsible for identifying the correct interpretation, whether or not asserted by the parties."), we must confront what the legislature intended by the phrase "without a franchise from the city." As a result, we requested and received supplemental memoranda from the parties addressed to that issue.

The city asserts in its supplemental memorandum that its utility-licensing scheme has the same characteristics as a franchise, in that it establishes the terms and conditions by which a utility may occupy its streets, and thus should be *treated* as a franchise from the city for purposes of ORS 221.450. The city urges us to construe ORS 221.450 to apply only when a utility does not have the city's permission to use the public rights-of-way, either because the city and utility cannot agree on franchise terms or because the city elects not to set terms and conditions by ordinance. However, in making that argument, the city posits that a "franchise" is created by contract, whereas a "license" is created by ordinance, such that those two terms maintain a distinct meaning—*viz.*, one creates a contract between the parties and the other does not.

Plaintiffs, for their part, contend that a franchise can be created only through a negotiated contract between the parties. *See Rose City Transit v. City of Portland*, 18 Or App 369, 381, 525 P2d 1325 (1974), *aff'd as modified*, 271 Or 588, 533 P2d 339 (1975) (quoting with approval from 12 McQuillin Municipal Corporations § 34.06 (3d ed 1970), that, when the right to use the streets is granted and accepted, the conditions of the grant become binding, "the same as the terms of any other contract"). Because a franchise creates a binding contract, plaintiffs conversely reason that a franchise can be created only by a negotiated contract. Plaintiffs assert that, in contrast, the city's licensing scheme is unilaterally imposed on plaintiffs by ordinance and is subject to unilateral modification by the city. Thus, they conclude that a utility license such as the city's cannot be a franchise under ORS 221.450. Additionally, plaintiffs urge us to reject the conclusion that a utility license and a franchise are equivalent because that conclusion could trigger unintended

consequences and future litigation for the utilities regarding certain provisions in their franchise agreements with other cities.

Before turning to our analysis, we note that the trial court touched in its letter opinion on the term "without a franchise from the city," using it to inform its analysis of what the legislature meant by the term "privilege tax." In doing so, the court appeared to conclude that a "franchise," as that term is used in ORS 221.450, could exist only as a result of a "franchise agreement," that is, a fully negotiated and executed contract between the city and the utility that the utility is free to reject. Thus, the trial court took the same view of the statute as do plaintiffs.

Because the term that we must construe—"without a franchise"—was enacted in 1931 and has not been meaningfully amended since then, we must determine the 1931 legislature's intention when it enacted the statute. *See, e.g., Blanchana, LLC v. Bureau of Labor and Industries*, 354 Or 676, 688, 318 P3d 735 (2014). "[I]n construing statutes that were enacted many years ago, we consult dictionaries that were in use at the time. Moreover, if a word has a well-defined legal meaning, we give the word that meaning in construing the statute." *Id.* (citations omitted). We also presume "that the legislature enacts statutes in light of existing judicial decisions that have a direct bearing upon those statutes." *Weber and Weber*, 337 Or 55, 67, 91 P3d 706 (2004).

The term "franchise" had a well-established legal meaning in 1931. "[F]ranchises are special privileges conferred by the government on individuals, and which do not belong to the citizens of the country generally of common right." *Elliott v. City of Eugene et al.*, 135 Or 108, 113, 294 P 358 (1930).[5] *See also* John Bouvier, 2 *Bouvier's Law*

---

[5] *See also Oregon v. Portland Gen. Elec. Co.*, 52 Or 502, 526, 95 P 722, *on reh'g*, 98 P 160 (1908) ("A franchise is (1) an incorporeal hereditament; and (2) a privilege or authority vested in certain persons by grant of the State to exercise powers to do and perform acts which, without such grant, they could not do or perform."); *Western Union Tel. Co. v. Hurlburt*, 83 Or 633, 638, 163 P 1170 (1917) ("[A] permission given by municipal ordinance to a private corporation to exercise some special privilege within the city, pursuant to an express delegation of legislative authority, is a grant by the state whereby the right conferred becomes a franchise and not a license."); *Whitbeck v. Funk*, 140 Or 70, 73-74, 12 P2d 1019 (1932) ("A franchise is a special privilege granted by the government to a person

*Dictionary and Concise Encyclopedia* 1299 (3d ed 1914) (defining franchise as "[a] special privilege conferred by government on individuals, and which does not belong to the citizens of the country generally by common right"); *Black's Law Dictionary* 515 (1889) (using same definition and adding, "[i]n this country, it is a privilege of a public nature, which cannot be exercised without a legislative grant"). In the existing judicial decisions of the time, determining whether a governmental grant was a franchise or, in contrast, a "mere license" depended on the type of grant given— whether it was a grant of a special privilege that was not available to the public generally or was a regulation of what could otherwise be done by common right.

In *Western Union*, a case decided in 1917, the Oregon Supreme Court addressed whether a city could levy a tax against the special franchise that the city had granted to Western Union to occupy the public rights-of-way in the city. Before it could address that question, the court had to decide whether the grant to Western Union was a franchise or a license. By way of answer, the court adopted the general rule that "a grant by a municipality to a corporation of the right to use the streets for water, gas, transportation, or other public service purpose * * * constitute[s] a franchise and not a mere license." 83 Or at 637-38. The court also announced the corollary principle that "a permission given by municipal ordinance to a private corporation to exercise some special privilege within the city, pursuant to an express delegation of legislative authority, is a grant by the state whereby the right conferred becomes a franchise and not a license." *Id.* at 638.

Similarly, in *Elliot*, a question before the court was whether the city's contract with Bray Bros., which gave Bray Bros. the exclusive right to collect and haul garbage in the city for three years, was a franchise. The court concluded that the contract was a franchise because "[t]he hauling of garbage is everywhere regarded as peculiarly subject to

---

or corporation, which privilege does not belong to the citizens of a country generally, of common right. * * * A franchise confers the right to exercise powers or to do and perform acts which, without such grant, the person to whom it is granted could not do or perform[.]" (citing *Portland Gen. Elec. Co.*, 52 Or at 526; *Western Union Tel. Co.*, 83 Or at 636)).

the police power of the state," and not one of common right. *Elliot*, 135 Or at 113, 115.[6] *Western Union* and *Elliot* thus instruct that whether an entity has a franchise depends on the nature of the rights that are granted, not the means by which those rights are granted.

With regard to utilities occupying the public rights-of-way in a city pursuant to city permission, it was well understood by 1931 that such permission could only be by franchise from the city (as delegated to the city from the state).[7] The 1931 legislature would have understood that a governmental grant to a utility to occupy the public rights-of-way for purposes other than travel created a franchise, regardless of the form of, or label given to, that governmental grant. To put it more directly, a "franchise," as that term is used in ORS 221.450, is the governmental grant to a utility of the special privilege to occupy the public rights-of-way; it is not a particular type of instrument (that is, it is not limited to a negotiated agreement). A franchise *can* be created by a negotiated contract, but it also can be created by other means. *See Strunk v. PERB*, 338 Or 145, 168-71, 108 P3d 1058 (2005) (concluding that PERS is a statutory contract). Our construction of the term is also supported by the statutory context.

As set out above, ORS 221.420 has provided since 1931 that cities have the power to "determine by contract or prescribe by ordinance or otherwise" the terms and conditions under which public utilities may occupy the streets, highways, and other public property within a city. Or Laws 1931, ch 103, § 8; ORS 221.420. If the trial court were correct that the legislature intended that a franchise could be

---

[6] Also demonstrating that principle is the later case of *Anthony et al. v. Veatch et al.*, 189 Or 462, 220 P2d 493, *on reh'g*, 221 P2d 575 (1950). There, the court relied on *Elliot* to conclude that the state requirement to obtain fixed-gear fishing licenses did not confer a franchise on the license holder because the right to fish is "one common to all citizens of Oregon." *Id.* at 477-78.

[7] We note that a city could determine that its permission will not be required for a utility to operate within the city's rights-of-way when the utility has obtained operating authority from another governmental source, such as the state. Operating in that manner could be preferable for cities that do not have the resources or desire to create and enforce a regulatory scheme for utilities operating within their rights-of-way. In such cases, a utility would be operating without a franchise from the city and, hence, would be subject to a privilege tax imposed under ORS 221.450.

conferred only by contract, then ORS 221.420 would not also have referred to ordinances "or otherwise" as means by which a city could prescribe the terms and conditions under which a public utility could occupy the city's streets. That the legislature knew the difference between the term "franchise" and "contract" is demonstrated by its use of those different terms in different contexts. If the legislature meant for ORS 221.450 to apply whenever a city had used something *other than a contract* to grant a utility the special privilege to occupy the city's rights-of-way, then that is what the legislature would have said. It is only by giving effect to the well-established meaning of the term "franchise"—*viz.*, the governmental grant of a special privilege—that ORS 221.420 and ORS 221.450 can be read together and still give meaning to all the words used.

We recognize that the Supreme Court said in a footnote in *US West Communications v. City of Eugene*, 336 Or 181, 81 P3d 702 (2003), that,

"[i]f certain conditions are met, a city either may enter into a franchise agreement that determines the 'charges and fees upon which any public utility * * * may be permitted to occupy the streets, highways or other public property within such city,' ORS 221.420(2), or may impose a privilege tax 'for the [utility's] use of [the] streets, alleys or highways' within the city, ORS 221.450."

*Id.* at 183 n 1 (alterations in original). The court's footnote suggests that the statutes operate as plaintiffs contend, that is, that a franchise can be created only by a "franchise agreement," and, otherwise, the utility is operating "without a franchise" and is subject to the terms of ORS 221.450.

However, that statement in *US West* is inapplicable *dicta* because the case was not concerned with the construction or application of ORS 221.420 or ORS 221.450 but, rather, with the construction of a different statute, ORS 221.515, in the context of a telecommunications provider that was indisputably operating under a negotiated franchise agreement with the city. *See* 336 Or at 183-84. In making that statement, the court had not sought to construe ORS 221.450 or to determine the meaning of the term "franchise" in it. Moreover, in *Northwest Natural Gas Co. v.*

*City of Portland*, 300 Or 291, 711 P2d 119 (1985), the court previously had recognized directly that the term "franchise" has the meaning that we give it now, and had proceeded to interpret the language of each utility's "franchise," which included an 1859 territorial grant, a 1932 revocable permit, a 1966 city ordinance, as well as a franchise agreement. *Id.* at 295-96, 307-11. Thus, the court recognized that franchises come in many different forms. It is the content of the grant—not the form in which it is granted—that creates a franchise.

We turn to whether plaintiffs were operating "without a franchise from the city" for purposes of ORS 221.450, making the statute applicable to the city's resolution that increased its utility-license fee to seven percent. Under the city's Utility Licensing Ordinance, each plaintiff is required to obtain a license from the city to occupy the public rights-of-way in the city. GRC 6.30.070. Each plaintiff applied for a license and then accepted and signed the terms of the license granted by the city. Under the Utility Licensing Ordinance, plaintiffs could negotiate with the city for terms other than the standard terms specified in the ordinance, *id.*, and some of plaintiffs' licenses did contain such different terms.

The licenses issued by the city to each plaintiff under the city's Utility Licensing Ordinance are franchises, as that term is used in ORS 221.450. It is by those licenses that the city granted to each plaintiff the special privilege of occupying the public rights-of-way within the city and set the terms, conditions, charges, and fees with which each utility is required to comply in exchange for that privilege. Because plaintiffs were operating under a franchise from the city, through the city's Utility Licensing Ordinance, ORS 221.450 does not apply and cannot preempt the city's resolution increasing its utility-license fee to seven percent.

Under a city's broad home-rule authority, a city can choose the manner in which it requires a utility to obtain its permission—*viz.*, its franchise—to occupy the public rights-of-way, and that authority includes the authority to require the utility to pay fees, negotiated or not, unless preempted by state or federal law. Here, ORS 221.450 has no application because the plaintiff utilities asked for and obtained a franchise from the city.

We recognize that a utility franchise takes on aspects of a contract, even if not granted by a contract. If the governmental grant satisfies the criteria for a franchise, then the grant is a franchise and its terms are interpreted like contract terms, with certain special limitations. *See, e.g., Northwest Natural Gas*, 300 Or at 306, 308 (explaining that a municipality cannot bargain away its authority to act for the public's general welfare and that doubtful franchise terms are to be "construed strictly against the grantee and liberally in favor of the public"). Here, under the terms of the franchises with plaintiffs, it appears that the city was authorized to adopt its resolution setting the increased amount of the utility-license fee. *See* GRC 6.30.110(1)(a) ("Each license granted pursuant to this article shall be subject to the condition that the licensee pays a license fee in an amount or by a method or methods established from time to time by council resolution * * *."). However, plaintiffs have not put the construction of their franchises at issue because their respective complaints for declaratory relief sought only a declaration that the city's fee resolution was preempted by ORS 221.450. Accordingly, we conclude that the trial court erred in granting summary judgment for plaintiffs and denying summary judgment for the city, and we reverse and remand.

Reversed and remanded.