No. 27 May 5, 2016 309

IN THE SUPREME COURT OF THE
STATE OF OREGON

NORTHWEST NATURAL GAS COMPANY,
an Oregon corporation;
and Portland General Electric Company,
an Oregon corporation,
*Plaintiffs-Respondents,*
*and*

ROCKWOOD WATER
PEOPLE'S UTILITY DISTRICT,
*Intervenor-Respondent,*
*Petitioner on Review.*

*v.*

CITY OF GRESHAM,
a municipality and public body
within the state of Oregon,
*Defendant-Appellant,*
*Respondent on Review.*
(SC S062535 (Control))

NORTHWEST NATURAL GAS COMPANY,
an Oregon corporation;
and Portland General Electric Company,
an Oregon corporation,
*Plaintiffs-Respondents,*
*Petitioners on Review,*
*and*

ROCKWOOD WATER
PEOPLE'S UTILITY DISTRICT,
*Intervenor-Respondent,*

*v.*

CITY OF GRESHAM,
a municipality and public body
within the state of Oregon,
*Defendant-Appellant,*
*Respondent on Review.*
(SC S062556)

(CC 1107-08422; CA A150990)

On review from the Court of Appeals.*

Argued and submitted May 11, 2015.

Bruce L. Campbell, Miller, Nash, Graham & Dunn, LLP, Portland, argued the cause and filed the brief for petitioners on review Portland General Electric Company and Northwest Natural Gas Company. With him on the brief was Jeffrey G. Condit.

Casey M. Nokes, Cable Huston, LLP, Portland, argued the cause and filed the brief for petitioner on review Rockwood Water People's Utility District. With him on the brief were Tommy A. Brooks and Clark I. Balfour.

David R. Ris, City Attorney, Gresham, argued the cause and filed the brief for respondent on review.

Lisa Rackner, McDowell Rackner & Gibson PC, Portland, filed the brief for *amici curiae* Avista, Idaho Power, and PacifiCorp. With her on the brief was Ruth Harper.

Katherine Thomas, League of Oregon Cities, Salem, filed the brief for *amicus curiae* League of Oregon Cities. With her on the brief was Sean O'Day.

Jesse E. Cowell, Davison Van Cleve, PC, Portland, filed the brief for *amici curiae* Industrial Customers of Northwest Utilities and the Northwest Industrial Gas Users. With him on the brief were Melinda J. Davison and Edward A. Finklea.

Before Balmer, Chief Justice, and Kistler, Walters, Landau, Baldwin, Brewer, and Nakamoto, Justices.**

BALDWIN, J.

The decision of the Court of Appeals is affirmed in part and reversed in part. The judgment of the trial court is affirmed in part and reversed in part, and remanded for entry of declaratory judgment in favor of Rockwood Water People's Utility District.

_____

* Appeal from Multnomah County Circuit Court, Stephen K. Bushong, Judge. 264 Or App 34, 330 P3d 65 (2014).

** Linder, J., retired December 31, 2015, and did not participate in the decision of this case.

**BALDWIN, J.**

Plaintiffs Rockwood Water People's Utility District (Rockwood PUD), Northwest Natural Gas Company (NW Natural) and Portland General Electric Company (PGE) seek review of a Court of Appeals decision upholding the validity of municipal enactments by respondent City of Gresham (the city) that increased the licensing fee that each utility was required to pay from five percent to seven percent of the utility's gross revenues earned within the City. Plaintiffs, collectively "the utilities," sought a declaration that the enactments were void and unenforceable because they conflicted with the provisions of ORS 221.450.[1] Alternatively, Rockwood PUD argued that it, as a people's utility district, could not be taxed more than five percent by a city without explicit statutory authority. On cross-motions for summary judgment, the trial court agreed with plaintiffs that the enactments violated ORS 221.450, and did not reach Rockwood PUD's alternative argument. On appeal, the Court of Appeals reversed, holding that the fee increase was not preempted by ORS 221.450 because the utilities were not operating "without a franchise" and that a city's home-rule authority to impose taxes or fees on a utility is not affected by a utility's municipal corporation status. *Northwest Natural Gas Co. v. City of Gresham*, 264 Or App 34, 330 P3d 65 (2014). Plaintiffs sought review in this court.

We hold both that the license fee imposed by the City was a "privilege tax" and that the affected utilities were operating "without a franchise" within the meaning of ORS 221.450. We also hold that the City was not preempted by ORS 221.450 from imposing the seven percent privilege tax on NW Natural and PGE, but that the City did not have express statutory authority to impose a tax in excess of five percent on Rockwood PUD under ORS 221.450. For the reasons explained below, we affirm, in part, the decision of the Court of Appeals on other grounds, and reverse in part.

---

[1] ORS 221.450, set out in more detail below, allows a city to "levy and collect a privilege tax" from a utility if the utility "is operating for a period of 30 days within the city without a franchise[.]" The privilege tax may not exceed "five percent of the gross revenues" of the utility earned within the city.

## I.   BACKGROUND

The record on summary judgment in this case consists of exhibits and stipulated facts, which we describe to provide the historical backdrop to the present controversy. The factual background is fairly straightforward, although, as described below, the legal landscape is somewhat more complex. Prior to 2002, NW Natural operated within the City pursuant to a negotiated franchise agreement. In 2002, NW Natural obtained a 10-year utility license. PGE operated within the City pursuant to a negotiated franchise agreement until 1992, under a 10-year utility license between 1992 and 2002, and thereafter, under a new 10-year utility license. Rockwood PUD operated in the City under a 10-year utility license beginning in 2001, which was extended an additional 10 years in 2011. From 2002 until 2011, and pursuant to City ordinance and resolution, NW Natural and PGE paid license fees that consisted of five percent of their gross revenues from operations within the City. Beginning in 2003, and pursuant to City ordinance and resolution, Rockwood PUD paid license fees that consisted of five percent of its user fees. These fees are in addition to permit fees that the utilities pay when they need to do specific work within the City's rights-of-way.

In May 2011, while each of the utilities was operating under a license, the City adopted a resolution to increase the license fees from five percent to seven percent, primarily to avoid service reductions in the fire and police departments. The City informed the utilities that the new fees would be effective on July 1, 2011.

Plaintiffs then filed this action for declaratory judgment, seeking a declaration that the City's resolution was preempted by state law, which they contended capped the City's license fee at five percent because the fee was, in effect, a "privilege tax" under ORS 221.450. As noted, Rockwood PUD also argued that the City could not charge the additional fee because it lacked specific statutory authority to do so. The City responded that ORS 221.450 did not preempt its home-rule authority to establish a seven-percent license fee, and that in any event the license fee was not a "privilege tax" and thus ORS 221.450 did not limit it in the manner

suggested by plaintiffs. The trial court agreed with plaintiffs on their first argument, and consequently did not reach Rockwood PUD's second argument. The trial court reasoned that the utilities were operating with a license and "without a franchise" for purposes of ORS 221.450, that, under this court's case law, a license fee of this sort is, in fact, a "privilege tax," and therefore that ORS 221.450 preempted the City's ordinance to the extent it sought to impose a privilege tax of more than five percent.

The City appealed, and the Court of Appeals disagreed with the trial court's analysis. In particular, although it acknowledged that the plaintiffs stipulated that they all were operating under licenses rather than franchises, the Court of Appeals concluded that the utilities nonetheless were not operating "without a franchise" within the meaning of that phrase as used in ORS 221.450. *Northwest Natural Gas Co.*, 264 Or App at 42, 48. The Court of Appeals therefore did not address the questions of whether the city had home-rule authority to enact the ordinance or whether the license fee in question was a "privilege tax," given its conclusion that in any event ORS 221.450 would not limit the City's ability to charge the fee because the utilities were not operating "without a franchise."[2]

The utilities sought review of the Court of Appeals' decision. The parties reprise the various arguments they made in the trial court and in the Court of Appeals. Northwest Natural and PGE contend that the trial court correctly concluded that the City's license fee is a "privilege tax" for purposes of ORS 221.450, and that the Court of Appeals erred in interpreting the phrase "without a franchise" as used in that statute. They contend that, historically, a "franchise" in this context is an agreement between a city and a utility, and that paying a

---

[2] The Court of Appeals, in a footnote, rejected without discussion Rockwood PUD's alternative argument that the City lacked authority to impose the fee against people's utility districts, citing its decision in *Rogue Valley Sewer Services v. City of Phoenix*, 262 Or App 183, 329 P3d 1 (2014). *Northwest Natural Gas Co.*, 264 Or App at 39 n 3. As discussed below, we have since affirmed that court's decision in *Rogue Valley Sewer Services v. City of Phoenix,* 357 Or 437, 353 P3d 581 (2015). The implications of that decision as to the present case are discussed below. *See* 359 Or at 331, 347-348.

unilaterally-imposed license fee does not create a "franchise." Rockwood PUD reiterates those arguments, and also repeats its alternative argument that the City lacked statutory authority to tax a people's utility district at a rate greater than five percent. *Amici curiae* appearing on behalf of the utilities argue that, as a matter of public policy, the Court of Appeals' result in this case will cause hardship on utility customers, as the utilities will simply pass on the percentage of the fees charged by the City to the users in the city on a *pro rata* basis, and thus contend that the fees amount to a "stealth tax" on utility customers that the City would not have been able to impose directly. *See* 359 Or at 333 n 15 (discussing manner in which utilities pass on fees to consumers).

The City, in turn, argues that it had home-rule authority to enact the license fee and that the legislature, in enacting ORS 221.450, did not demonstrate a clear intention to preempt such local fees. It further argues that the fee in question is not a "privilege tax" and that the Court of Appeals correctly concluded that the utilities in this case were not operating "without a franchise" because the licenses were a form of franchise. The City also asserts that ORS 221.420(2)(a) provides statutory authority for its imposition of a license fee on a PUD. Finally, in response to *amici curiae*'s policy arguments, the City notes that the fees were established by ordinance through a political process and that constituents that oppose the fees may do so by taking part in that political process. *Amicus curiae* League of Oregon Cities also argues on the City's behalf that the Court of Appeals' analysis was correct, and that ORS 221.450 was never intended by the legislature to limit a city's ability to obtain compensation from utilities in the manner suggested by the utilities.

We first examine whether the license fee was a "privilege tax" for purposes of ORS 221.450 and whether the affected utilities were operating "without a franchise" within the meaning of those statutory terms. We then address whether the City was preempted by ORS 221.450 from imposing the seven percent license fee on NW Natural and PGE and whether the amount of the fee in excess of five percent was an invalid intergovernmental tax on Rockwood

PUD under ORS 221.450. We begin with a brief discussion of the applicable ordinances and statutes.

## II.   ANALYSIS

### A.   *The Ordinances and Statutes*

We first set forth the pertinent portions of the City's code. As an initial matter, it contains definitions of both the terms "franchise" and "license." It defines "franchise" as "[a]n ordinance or agreement between the city and a franchisee which grants a privilege to use public rights-of-way within the city for a dedicated purpose and for specific compensation." GRC 6.30.030. It defines "license" as "[a]n ordinance or other document which grants, on a non-exclusive basis, permission to the licensee to use public rights-of-way within the city for a specified and dedicated purpose." *Id.* GRC 6.30.070 provides:

"(1)   License. A license shall be required of any utility that occupies public rights-of-way whether such use is by placing utility facilities in the public rights-of-way, by using utility facilities owned or operated by other utilities, or by attaching or locating utility facilities to, on, upon, or within the utility facilities of another. *** No person shall operate a utility *** that occupies a public right-of-way without a license.

"* * * * *

"(6)   Rights granted. No license granted pursuant to this ordinance shall convey any right, title or interest in the public rights-of-way, but shall be deemed a grant to use and occupy the public rights-of-way for limited purposes and term, and upon the conditions stated in the license. The person granted the license shall have no property interest or other right in the license except as provided by this ordinance.  A license granted pursuant to this ordinance is not a contract.

"* * * * *

"(9)   Additional Terms and Conditions. The manager and applicant may negotiate additional terms and conditions to clarify, enhance, expand or waive the provisions of this ordinance. The additional terms and conditions may conflict with the terms of GRC Articles 6.30 and 6.35 with

the review and approval of council. Such agreement shall be in writing and signed by both the city and applicant."[3]

GRC 6.30.110 provides:

> "(1)   License Fee.
>
> "(a)   Each license granted pursuant to this article shall be subject to the condition that the licensee pays a license fee in an amount or by a method or methods established from time to time by council resolution which may include payment of a minimum license fee. The city may elect in the resolution establishing the license fee to dedicate all or a portion of the license fee to specific funds, projects or programs of the city.
>
> "* * * * *
>
> "(6)   Privilege Tax.
>
> "(a)   Any utility that operates without a license for a period of 30 days or more within the city and uses public rights-of-way in the city for other than travel, shall pay a privilege tax in the amount set by council resolution for the use of those public rights-of-way."

Resolution 3056, adopted by the City in May 2011, increased the license fee authorized by GRC 6.30110(1)(a) from five to seven percent. That resolution indicated that the fees would primarily be used to fund "core city-wide services such as Police, Fire and Parks," and that a smaller portion would be used for streetlights.

Thus, the Gresham ordinances contemplate that any utility that uses its rights-of-way will obtain a license to do so, that the city will establish the amount of the license fees by resolution, and that utilities that operate without a license in the city's rights-of-way will pay a privilege tax in an amount set by resolution. Pursuant to those enactments, the city established a license fee of seven percent.

The utilities argue that license fees in excess of five percent are prohibited by state statute, and that, to

---

[3]  It does not appear that the PGE or Rockwood PUD licenses at issue in this case contained any additional terms pursuant to this provision. The Northwest Natural license stated some additional terms made pursuant to this provision but those provisions did not pertain to license fees.

the extent that the City's fee exceeds five percent, it is pre-empted by statute. The current versions of the pertinent statutes are as follows. As an initial matter, ORS 221.410(1) provides that, "[e]xcept as limited by express provision or necessary implication of general law, a city may take all action necessary or convenient for the government of its local affairs." In addition, ORS 221.415 provides:

> "Recognizing the independent basis of legislative authority granted to cities in this state by municipal char-ters, the Legislative Assembly intends by ORS 221.415, 221.420, 221.450 and 261.305 [concerning general powers of people's utility districts] to reaffirm the authority of cit-ies to regulate use of municipally owned rights of way and to impose charges upon publicly owned suppliers of electri-cal energy, as well as privately owned suppliers for the use of such rights of way."

ORS 221.420(2) indicates that a city "may"

> "(a)  Determine by contract or prescribe by ordinance or otherwise, the terms and conditions, including payment of charges and fees, upon which any public utility *** [or] people's utility district *** may be permitted to occupy the streets, highways or other public property within such city and exclude or eject any public utility or heating company therefrom.
>
> "* * * * *
>
> "(d)  Provide for a penalty for noncompliance with the provisions of any charter provision, ordinance or resolution adopted by the city in furtherance of the powers specified in this subsection."

ORS 221.450 provides:

> "Except as provided in ORS 221.655 [concerning priv-ilege taxes on distribution utilities], the city council or other governing body of every incorporated city may levy and collect a privilege tax from Oregon Community Power and from every electric cooperative, people's utility district, privately owned public utility, telecommunications carrier as defined in ORS 133.721 or heating company. The priv-ilege tax may be collected only if the entity is operating for a period of 30 days within the city without a franchise from the city and actually using the streets, alleys or high-ways, or all of them, in such city for other than travel on

such streets or highways. The privilege tax shall be for the use of those public streets, alleys or highways, or all of them, in such city in an amount not exceeding five percent of the gross revenues of the cooperative, utility, district or company currently earned within the boundary of the city. However, the gross revenues earned in interstate commerce or on the business of the United States Government shall be exempt from the provisions of this section. The privilege tax authorized in this section shall be for each year, or part of each year, such utility, cooperative, district or company, or Oregon Community Power, operates without a franchise."

The utilities do not argue that ORS 221.450 fully preempts the City's licensing provisions. That position is consistent with our determination in *Rogue Valley Sewer Services*, 357 Or at 455, that "ORS 221.420 and ORS 221.450 do not create a statutory scheme that prevents the state law and local ordinance from operating concurrently." The utilities argue that, for the most part, the ordinances are consistent with the statute—that both can operate concurrently—but that the resolution increasing the license fee under ORS 6.30.110 from five to seven percent is preempted because the license fee is a type of "privilege tax" and the City is limited to charging a "privilege tax" in "an amount not exceeding five percent of the gross revenues of the cooperative, utility, district or company currently earned within the boundary of the city." ORS 221.450.

B. *ORS 221.450*

We first examine what the legislature meant when it used the terms "privilege tax" and "without a license." When interpreting a statute, our goal is to discern legislative intent. *State v. Gaines*, 346 Or 160, 171, 206 P3d 1042 (2009). The meanings of most of the terms of ORS 221.450 are clear, when viewed in context. ORS 221.450 authorizes a city to levy and collect a "privilege tax" from a utility under certain conditions—that the utility "is operating for a period of 30 days within the city without a franchise," and that the utility is "actually using" the city's streets, alleys, highways, etc., for "other than travel." The "privilege tax" is "for the use of those public streets, alleys or highways." It may be levied "for each year, or part of each year," that the utility operates

"without a franchise." Thus, what a city can do (levy a tax in specific circumstances) and against whom (a utility without a franchise) are clear from the text. We now turn to what the legislature meant by its use of the terms "privilege tax," and "without a franhise."

To interpret a statute, we look to the text and to how the terms are used in context. As noted, ORS 221.420 indicates that a city may "[d]etermine by contract or prescribe by ordinance or otherwise, the terms and conditions, including payment of charges and fees, upon which any utility *** may be permitted to occupy" its streets. That statute originated in 1911, as part of a comprehensive bill regulating utilities. *See* Or Laws 1911, ch 279, § 61(1).[4] The 1911 enactment created a commission "to regulate telegraph, telephone, street railroad, heat, light, water, and power plants so that a safe and adequate service may be rendered to the public at reasonable and sufficient rates." *Woodburn v. Public Service Commission*, 82 Or 114, 118, 161 P 391 (1916). Because existing municipal franchise agreements at the time of that enactment often set rates to be charged for utility services, questions arose concerning whether the utilities could charge only the rates established by the commission or other rates set by their municipal franchise agreements. In *Woodburn*, the court rejected the city of Woodburn's argument that its home-rule authority permitted it to establish telephone rates by way of its franchise agreement, concluding that home-rule authority did not include "any subjects except those 'that are purely local and municipal in character.'" *Id.* at 124 (citations omitted). The court concluded that "[t]he right to regulate rates is a matter of general concern, and does not pertain solely to local municipal affairs." *Id.* at 125 (citation omitted); *see also Portland v. Public Services Commission*, 89 Or 325, 334-35, 173 P 1178 (1918) (rejecting similar argument, holding that neither the city's original charter granted by the legislature nor its home-rule authority later granted by Article XI, section 2, of the Oregon Constitution, gave it authority to set utility rates). Similarly, despite the enactment of the home-rule provision of the

---

[4] The text in the 1911 statute used the language "determine by contract, ordinance or otherwise." In 1931, it was changed to "determine by contract or prescribe by ordinance or otherwise." Or Laws 1931, ch 103, § 8.

constitution, this court had, at least in some circumstances, continued to follow the general common-law principle that a city had no inherent power to tax. *See, e.g.*, *Portland v. Portland Ry., L. & P. Co.*, 80 Or 271, 297, 156 P 1058 (1916) (city lacked authority to enact ordinance imposing tax on gross receipts of corporations selling electricity).[5]

ORS 221.450 was originally enacted in 1931, and no legislative history exists to enlighten us on its original purpose. It constituted the first section of the following enactment:

"Section 1. The city council or other governing body of every incorporated city and town in Oregon hereby is authorized to levy and collect from every privately owned public utility operating within such city or town without a franchise, for the period of one year, a privilege tax for the use of the public streets, alleys and highways in such city or town, in an amount of not less than 5 per cent annually, of the gross earning revenue of such utility currently earned within the boundary of such city or town. Should such utility fail or neglect to pay such tax the city or town levying the same may begin any suit or action or proceeding in any court of the state of Oregon to collect the same.

"Section 2. That all poles, posts, towers, wires, conduits, mains, pipes, rails, tracks, ties, railways, pole lines, telegraph, telephone or electric transmission lines, or structures or equipment of any kind, placed in, on, upon, over, under or beneath any public highway, street or alley of this state or any municipal corporation, under or by virtue of any grant, privilege or franchise, shall be removed by the owners or owner of the same within one year after the expiration of the grant, privilege or franchise, which permitted the erection or installation of the same, unless further time be granted by the municipal corporation having authority so to do, and if not removed within one year after the termination or expiration of the franchise or such further time as may be granted by any such municipal corporation, all and every part thereof shall be forfeited and escheated to the municipal corporation wherein situated, and where any

---

[5] It was not until *Jarvill v. City of Eugene*, 289 Or 157, 169, 613 P2d 1, *cert den.*, 449 US 1013 (1980), that this court fully recognized that home-rule authority included authority to tax. *See* _US West Communications v. City of Eugene_, 336 Or 181, 186 n 8, 81 P3d 702 (2003) (discussing this evolution of home-rule analysis).

such franchise has expired prior hereto or prior to the time this act shall take effect, then the time for removal shall run from the date this act becomes effective.

"Section 3.   Any and all franchises, privileges or permits for the use of the public highways, streets or alleys hereafter granted by any municipal corporation shall not be granted for a longer term than 20 years, and shall be subject to the provisions of section 2 of this act."[6]

Or Laws 1931, ch 234.

Thus, as originally enacted, it is clear that the statute did not place an upper limit on what a city could charge a utility for use of its streets—rather, it authorized cities to impose a privilege tax that was "not less than" five percent. As enacted, then, the statute could not have had the effect that the utilities now urge—it did not embody a public policy of curtailing taxes by municipalities, because it set no upper limit on the amount of the privilege tax. Or Laws 1931, ch 234, § 1.

The context of the statute includes "other provisions of the same statute and other related statutes." *PGE v. Bureau of Labor and Industries*, 317 Or 606, 611, 859 P2d 1143 (1993). Context also includes statutes enacted simultaneously as well as prior versions of the same statute. *State v. McDowell,* 352 Or 27, 30-31, 279 P3d 198 (2012). The context provided by sections 2 and 3, while not definitive, does support our conclusion that section 1 (ORS 221.450) was not originally for the purpose of placing limits on the ability of cities to charge utilities for the use of its streets. In light of the case law discussed above, there is no reason to think that the legislature believed that the cities had home-rule authority to impose a privilege tax; rather, the more likely intention of the legislature in enacting section 1was to *authorize* cities to impose a privilege tax. The final sentence of section 1 related to a city's efforts to collect taxes imposed; section 2 related to a utility's duty to remove various items from the public streets of a city "after expiration of

---

[6] Also in 1931, the statute that later was codified at ORS 221.420 was amended, as part of a larger enactment that created the Public Utilities Commission. The text continued to make reference to a city's ability to "determine by contract or prescribe by ordinance or otherwise" the various terms on which utilities could use the streets. Or Laws 1931, ch 204, § 1.

the grant, privilege or franchise," and provided for forfeiture of those items to the city if not removed. All of those provisions appear to have been directed toward providing a city with a remedy in situations where a utility had no franchise but was continuing to utilize the city's streets.[7]

It bears noting that section 1, which ultimately became ORS 221.450, used the term "without a franchise," while section 2 made reference to expiration of a "grant, privilege *or* franchise," and section 3 made reference to "all franchises, privileges *or* permits." (Emphases added.) It is generally presumed that when the legislature uses the same term through an enactment, it intended that term to have the same meaning. *State v. Shaw*, 338 Or 586, 603, 113 P3d 898 (2005). Further, "in the absence of evidence to the contrary, we ordinarily assume that the legislature uses terms in related statutes consistently." *State v. Cloutier*, 351 Or 68, 99, 261 P3d 1234 (2011). Another corollary of that maxim of construction is that, if the legislature uses *different* terms in related statutes, it likely intended them to have different meanings. *Dept. of Transportation v. Stallcup*, 341 Or 93, 101, 138 P3d 9 (2006). And finally, *inclusio unius est exclusio alterius*—the inclusion of one is the exclusion of the other—appears to have some bearing here. In light of those maxims, it would be difficult—although not impossible—to conclude that the legislature chose to use the single word "franchise" in section 1 to convey an extremely broad meaning, encompassing, as the Court of Appeals held in this case, any "governmental grant of a special privilege," *Northwest Natural Gas Co.*, 264 Or App at 47, but in the other two sections of the same legislation, included the term "franchise" with

---

[7] *Amicus* Oregon League of Cities speculates that the legislation may have been a result of a dispute wherein a utility continued to use Portland streets after the expiration of its franchise in 1927. *City of Portland v. Pacific Telephone & Telegraph Co.*, 5 F Supp 79 (1933). That explanation seems plausible in light of the context. The question presented in that case was, in some ways, the obverse of the question presented here. In that case, after a utility had continued to use its rights-of-way without a franchise, the city sought to collect the privilege tax authorized by then-newly enacted ORS 221.450, and the utility responded by arguing that the home-rule provision of the Oregon Constitution divested the legislature of authority to enact the 1931 statute. The court rejected that argument, concluding that home-rule authority pertained solely to local municipal matters, and the constitutional provision did not "withdraw from the legislative assembly the power to pass laws general in their operation and character, or which relate to municipal highways and affect their public use." *Id.* at 80.

"grant" and "privilege" in section 2, and with "privileges" and "permits" in section 3. That is, if "franchise" was meant to convey so broad of a meaning to include any government "grant" or "privilege" or "permit," it would seem unlikely that the legislature would have felt the need to include "grant," and "privilege" and "permit" in addition to "franchise" in the other sections of the act.

In 1933, the legislature changed the "one year" period in the statute to 30 days, and also changed "not less than five percent" to "not exceeding five percent." Or Laws 1933, ch 24, § 1; ch 466, § 1. At that point, by making the five percent a maximum rather than a minimum, it is at least possible that the legislature then intended to curtail the amount of fees that cities could charge utilities for use of rights-of-way. It bears noting, however, that sections 2 and 3 of the same enactment continued to refer, respectively, to "grant, privilege or franchise" and "franchises, privileges or permits." Or Laws 1933, ch 466 §§ 2, 3.[8] We have no legislative history to further guide us with respect to the 1933 changes.

C.   *"Privilege Tax"*

The term "privilege tax" has long been used in various legal contexts, including the context of municipal utility franchises. The parties offer a number of definitions, focusing on how that term was used when the statute was originally enacted. A "privilege tax" generally is a "tax on the privilege of carrying on a business for which a license or franchise is required." *Black's Law Dictionary*, 1422 (3d ed 1933). That broad of a definition is not particularly helpful, because whether something is considered a "privilege tax" depends largely on the context in which the term is used. For example, that dictionary definition would not fit well in the present circumstance, as one thing is clear about ORS 221.450—the "privilege tax" at issue there may be levied only against utilities operating "without a franchise," not against utilities operating with a franchise. The term

---

[8] Although ORS 221.450 has undergone several changes since the 1930s, those changes did not directly affect how the terms "privilege tax" and "without a franchise" were used in the statute. A 1987 change in ORS 221.420 and ORS 221.450 which added people's utility districts to the utilities covered, see Oregon Laws 1987, chapter 245, sections 2 and 3, is discussed below. 359 Or at 331-333, 339-342.

"privilege tax" is generic enough that it often must be evaluated specifically in light of its context. *See, e.g., Pacific First Federal v. Dept. of Rev.*, 308 Or 332, 779 P2d 1033 (1989) (corporate excise tax considered a privilege tax); *Multnomah Kennel Club v. Dept. of Rev.*, 295 Or 279, 286-87, 666 P2d 1327 (1983) (statute imposing license fee in lieu of "all other licenses and privilege taxes" did not preclude county from imposing business income tax, because it was not a license fee or privilege tax); *Houck & Sons v. Ellis*, 229 Or 21, 29, 336 P2d 166 (1961) (license fee considered a "privilege tax").

The utilities cite *Northwest Auto Co. v. Hurlburt*, 104 Or 398, 408, 207 P 161 (1922) for the proposition that "privilege tax" under Oregon law includes license fees:

> "The courts in speaking of financial exactions of the character herein discussed have sometimes called them 'licenses,' and sometimes 'privilege taxes.' Again, they are sometimes spoken of as 'license fees' or 'license taxes'; but, by whatever name they may be called, they partake of the nature of a tax in many respects, and the designation given in the statute is immaterial, the courts being interested in the substance rather than in the name. In *Briedwell v. Henderson*, [99 Or 506, 195 P 575 (1921)], we held it to be properly called a privilege tax, the result of this tax being substantially a license, a certificate that the person paying the sum required was permitted to use a particular car upon the highway for the whole or what time might remain of the current year."

*Northwest Auto Co.* stands for the unremarkable proposition that, regardless of how something is labeled, it may function as a "privilege tax," and that the labeling of something as a license fee does not preclude it from being considered a privilege tax.[9] It does not follow, however, that everything

---

[9] In *Northwest Auto Co.*, an auto dealer argued that it should be exempt from paying personal property tax on autos in its inventory, on the ground that when they sold, their new owners would need to pay license fees that, under state statute, were "in lieu of all other taxes and licenses, except municipal license fees." 104 Or at 404. After examining the pertinent statutes (which did not actually contain the term "privilege tax") the court concluded that the licensing fee scheme did not preclude taxation of the automobiles in the dealer's inventory. *Id.* at 413. We think *Northwest Auto Co.* supports the general conclusion that the determination of the nature of a challenged tax or fee depends largely on context—it provides no definitive answer as to what is or is not a "privilege tax" or a "license fee."

designated as a license fee is a "privilege tax," regardless of the context in which those terms are used. *See, e.g.,* [US West Communications v. City of Eugene](), 336 Or 181, 187, 81 P3d 702 (2003) ("ORS 221.515 limits only the city's ability to recover a privilege tax for the use of public rights-of-way" but does not limit a city's ability to impose other license and registration fees or taxes on telecommunications carrier).[10]

The legislature's use of the term "privilege tax" in the present context is unremarkable, as that term often is used in the context of a "tax on the privilege of carrying on a business for which a license or franchise is required," *Black's Law Dictionary* at 1422, and ORS 221.450 specifically concerns a utility's use of the "streets, alleys or highways" of a city—a use for which a license or franchise generally is required. *See, e.g.,* ORS 221.420(2); GRC 6.30.070(1). "Privilege tax" *could*, therefore, encompass both franchise fees and license fees for the use of city streets within its meaning—except that we know from the inclusion of the words "without a franchise" in the statute that the legislature did not intend to encompass franchise fees, because it authorized the privilege tax only with respect to utilities operating without a franchise.[11] However, nothing in the text, context, and history of the statute, or in the treatises or case law described above, indicates that the legislature

---

[10] Although the issue presented in *US West Communications* bears some general similarity to the issue raised here, ORS 221.515—at issue in that case—differs significantly from ORS 221.450 in both origin and wording. For example, ORS 221.515 specifies that an entity that pays the "privilege tax" authorized by that statute for use of a city's public rights-of-way "shall not be required to pay any additional tax or fee on the gross revenues that are the measure of the privilege tax." We held that ORS 221.515 did not preempt the challenged fee at issue in that case, because the fee was not imposed for the use of the city's public rights-of-way. 336 Or at 187.

[11] We note that in *Rogue Valley Sewer Services*, 357 Or at 447, we held that a five percent franchise fee imposed on a sanitary authority was not, in fact, an "intergovernmental tax," and that a city had home-rule authority to impose such a fee. We based our conclusion that it was not a tax on the nature of the charge—it was to be used to cover the costs associated with the sewer service's use of the rights-of-way and maintenance and repair of city-owned facilities within the rights-of-way, rather than "for general public purposes or to raise revenue for such purposes." That aspect of the *Rogue Valley Sewer Services* opinion is discussed in more detail below. *See* 359 Or at 347-348. For purposes of our present discussion, we simply note that whether or not something is an "intergovernmental tax" does not answer the question of what the legislature meant by "privilege tax" in ORS 221.450.

would have intended a city's imposition of the type of fee at issue here on a utility for use of the city's public rights-of-way to be considered anything other than a "privilege tax" as that term is used in ORS 221.450. That is, it appears to fall within the standard legal definition of "privilege tax"—a tax on "the privilege of carrying on a business for which a license or franchise is required." *Black's Law Dictionary* at 1422. We therefore conclude that the fee at issue here is the type of charge the legislature intended to be considered a "privilege tax" for purposes of ORS 221.450, if it is imposed on a utility that is operating "without a franchise."

D.   *"Without a Franchise"*

        That leads us to the second part of our inquiry: What did the legislature intend when it used the phrase "without a franchise"? "Franchise" has a fairly well-defined meaning within the context of municipal law. In its decision, the Court of Appeals quoted and relied on an extremely broad definition of franchise:

> "'[F]ranchises are special privileges conferred by the government on individuals, and which do not belong to the citizens of the country generally of common right.' *Elliott v. City of Eugene et al.,* 135 Or 108, 113, 294 P 358 (1930). *See also* John Bouvier, 2 *Bouvier's Law Dictionary and Concise Encyclopedia* 1299 (3d ed 1914) (defining franchise as '[a] special privilege conferred by government on individuals, and which does not belong to the citizens of the country generally by common right'); Black's Law Dictionary 515 (1889) (using same definition and adding, '[i]n this country, it is a privilege of a public nature, which cannot be exercised without a legislative grant')."

*Northwest Natural Gas Co.*, 264 Or App at 44-45. However, the 1914 Bouvier text also indicated that there were differences between English common law and American law, and that American "franchises *spring from contracts* between the sovereign power and private citizens, made upon a valuable consideration, for purposes of public benefit as well as of individual advantage." 2 *Bouvier's Law Dictionary* at 1299 (citing 4 Thomp. Corp. § 5335 (emphasis added)).

        That definition is similar to one found in another early dictionary, defining a franchise as:

"A species of incorporeal hereditament[12] *springing from a contract* between the state and a private citizen or citizens, made upon valuable consideration, for purposes of public benefit as well as individual advantage."

James A. Ballentine, *Law Dictionary with Pronunciations* 525 (1930) (emphasis added). In McQuillin's treatise on municipal law, the author states:

"The term franchise as it is ordinarily used in the decisions and by text writers, and as used in this chapter, means the right granted by the state or a municipality to an existing corporation to do certain things that a corporation or individual otherwise cannot do, such as the right to use a street or alley for a commercial or street railroad track, or to erect thereon poles or string wires for telegraph, telephone, or electric light purposes, or to use the street or alley underneath the surface for water pipes, gas pipes, or other conduits.

Eugene McQuillin, 12 *The Law of Municipal Corporations* § 34:3, 24 (3d ed 2006) (McQuillin). The treatise goes on to note that, under the law of some jurisdictions, a city's grant of such privileges may be considered a mere license, but in most jurisdictions are considered franchises. *Id.*, § 34:4 at 25; 34:6 at 31-32. It further provides:

"When the right to use the streets is granted and accepted and all conditions imposed incident to the right performed, *it ceases to be a mere license and becomes a valid contract* \*\*\*. However, until an ordinance granting a franchise is accepted, the franchise lacks the essential elements of a contract. It is a mere proposition."

*Id.* § 34:5 (emphasis added). Thus, the view expressed in McQuillin is that the type of arrangement whereby a city allows a utility to use its streets for purposes of providing utility services is generally known as a franchise, although it might be a mere license. In sum, the more prevalent use of the term "franchise" is to describe a type of *agreement* between a municipality and a utility—something that is granted and accepted—that ceases to be a mere license and becomes a valid contract.

---

[12] An incorporeal hereditament is "a right issuing out of a corporate thing (whether real or personal) or concerning, or annexed to, or exercised within, the same." James A. Ballentine, *Law Dictionary with Pronunciations* 628 (1930).

The Court of Appeals in this case looked to much of the same source materials, and noted, based in part on the case law discussed below, that under Oregon law (and consistent with the majority rule described in McQuillin),

> "permission given by municipal ordinance to a private corporation to exercise some special privilege within the city, pursuant to an express delegation of legislative authority, is a grant by the state whereby the right conferred becomes a franchise and not a license."

*Northwest Natural Gas Co.*, 264 Or App at 45 (quoting *Western Union Tel. Co. v. Hurlburt*, 83 Or 633, 638, 163 P 1170 (1917)). However, it went on to conclude, nonetheless, that if "franchise" was meant to refer only to a traditional contractual arrangement, "then ORS 221.420 would not also have referred to ordinances 'or otherwise' as means by which a city could prescribe the terms and conditions under which a public utility could occupy city streets." *Northwest Natural Gas Co.*, 264 Or App at 47. The Court of Appeals' analysis suggests that "franchise" has a broader meaning than "contract" because cities may make arrangements with utilities not only through contracts but by ordinance and otherwise pursuant to ORS 221.420. Therefore, it reasoned, "without a franchise" as used in ORS 221.450 means, in essence, without an arrangement with the city by contract, ordinance or otherwise—including a licensing arrangement such as that set forth in the Gresham ordinances described above. That reasoning seems to assume that if "franchise" means something broader than a traditional "contract" and is something that can be achieved by way of an ordinance, then it necessarily must encompass the type of ordinances at issue here, setting forth a licensing fee scheme. While the Court of Appeals' premise seems undoubtedly correct—a franchise is not always created by way of a traditional contract—its conclusion that a "franchise" is created by way of ordinances authorizing a city to issue licenses requires closer examination.

It is clear, from Oregon cases as well as numerous cases discussed in McQuillin, that franchises can be created by ordinance instead of by a traditional contract. It is

less clear that ordinances that establish generic licensing schemes, such as the one at issue here, necessarily create a franchise whenever a license is issued. Historically, it was a common practice for a municipality to enact an ordinance granting a franchise to a specific utility, which, as noted above, became a contract when accepted by the utility. *See, e.g., Hillsboro v. Public Service Commission,* 97 Or 320, 324-25, 187 P2d 617 (1920) (city enacted an ordinance granting a franchise, and "when the franchise was granted by the city and accepted by the public service corporation, it was a valid contract"); *Newsom v. City of Rainier*, 94 Or 199, 202, 185 P 296 (1919) (concerning a "franchise embodied in" an ordinance that specifically related to the provision of water services by the defendant and contained provisions for termination); *Benbow v. The James Johns*, 56 Or 554, 556, 108 P 634 (1910) (discussing a city ordinance granting a franchise to a ferry transportation company, reserving to the city a percentage of the earnings). In fact, it is not clear that any of the municipal franchises discussed in pre-1931 Oregon cases were created by a licensing scheme such as the one at issue in this case, as opposed to ordinances or resolutions that granted a specific franchise to a specific utility company by way of agreement.[13]

Finally, our prior case law, while not specifically addressing the meaning of franchise, does state that ORS 221.450 concerns franchise *agreements*, thus indicating a narrower view of "franchise" than that taken by the Court of Appeals. In *US West Communications*, 336 Or 181, we addressed related but substantially different statutes concerning a city's imposition of a privilege tax on a telecommunications carrier. In doing so, we observed:

> "If certain conditions are met, a city either may enter into a *franchise agreement* that determines the 'charges and fees upon which any public utility *** may be permitted to occupy the streets, highways or other public property within such city,' ORS 221.420(2), or may impose a privilege tax 'for the [utility's] use of [the] streets, alleys or highways' within the city, ORS 221.450."

---

[13] The record in this case discloses that prior franchise agreements between some of the utilities and the City of Gresham were achieved by ordinance, as well.

*Id.* at 183 n 1 (brackets in original; emphasis added). Although the parties recognize that that statement is *dictum*, the utilities argue that it nonetheless evinces a sound understanding of the manner in which the statutes were meant to work.

That statement from *US West Communications*, although *dictum*, was implicitly endorsed in our recent decision in *Rogue Valley Sewer Services*. *Rogue Valley Sewer Services* primarily concerned an issue somewhat similar to that raised by Rockwood PUD in its alternative argument— whether a city could impose a "franchise fee" on a provider of sewer services. The plaintiff in that case, unlike the utilities in the present case, was not among the utilities specifically included in ORS 221.420(2)(a) and ORS 221.450. The plaintiff argued that ORS 221.420 and ORS 221.450 established the exclusive basis on which a city could impose fees on utilities for use of rights-of-way and therefore the city's "franchise fee" was preempted. We stated:

> "[T]he legislature has provided a framework for cities to collect a franchise fee from utilities, both public and private, operating within their rights-of-way. *See* ORS 221.420; ORS 221.450. Where cities and utilities have not entered into an *agreement* for a different fee arrangement, the legislature provides for a five percent fee. ORS 221.450."

*Rogue Valley Sewer Services*, 357 Or at 450 (emphasis added).

We concluded that nothing in those statutes indicated a legislative intent to preempt a city's imposition of a franchise fee on a provider of sewer services. In the course of addressing the plaintiff's argument, we quoted from the legislative history of a 1987 amendment to ORS 221.450[14] that sheds some light on the legislative intent of ORS 221.450:

> "The legislative history of House Bill (HB) 3021—the 1987 revision to ORS 221.420 and ORS 221.450—suggests that the legislature was told that the statutes would operate so that ORS 221.450 functioned as a 'penalty clause,' such that,

---

[14] The 1987 amendments to the statute are discussed more fully below. 359 Or at 339-342.

"'if *** [y]ou, as a private utility *** don't sit down and negotiate a franchise regulation ordinance or agreement so that we're working together, then you're going to pay more. You're going to pay five percent. *If you come in and get a franchise, and you sit down at the table *** and we mutually regulate it together*, basically, then [you pay less].'

"Tape Recording, House Committee on Environment and Energy, HB 3021, Apr 22, 1987, Tape 122, Side B (statement of Larry Shaw)."

*Rogue Valley Sewer Services*, 357 Or at 452 (brackets and ellipses in *Rogue Valley Sewer Services*; emphasis added).

That legislative history, although scarcely definitive, does suggest several things. First, it suggests that the legislative intent we have gleaned regarding the initial 1931 enactment—that it was not to establish what a city could charge to utilities for use of rights-of-way but to assist cities in negotiating agreements with utilities for their use of rights-of-way—had not altered over the course of half a century. That is, the assumption of Shaw's testimony was that a five percent "penalty" privilege tax created a sufficient incentive for utilities to work out franchise agreements with the cities they served. Second, the broad phrase "franchise regulation ordinance or agreement," used by Shaw in his testimony quoted above, does not suggest an extremely narrow view of the term "franchise" as meaning a traditional "contract," but it does suggest, particularly given that it was used with the terms "negotiate" and "mutually regulate it together," what our case law has suggested: The word "franchise" as used in ORS 221.450 refers to an agreement. *See Rogue Valley Sewer Services*, 357 Or at 450; *US West Communications*, 336 Or at 183 n 1.

On the other hand, another statement made by Shaw to the 1987 committee considering the amendments to ORS 221.450 could support a conclusion that Shaw did not make any distinction between a fee imposed through a negotiated franchise agreement and a licensing fee. As we noted in *Rogue Valley Sewer Services*, the 1987 amendments came about because

"the legislature was reacting to the then-recent circuit court decision in *Columbia River People's Utility District*

> *v. City of St. Helens et al*, No. 85-2236 (Columbia County Circuit Court, July 15, 1986). In that case, the circuit court held that 'the legislature has declared by inference that People's Utility Districts are not subject to franchise fees (excise taxes) such as defendant cities desire to impose.'"

357 Or at 456 n 4. The 1987 legislation amended ORS 261.305, governing PUDs, and added a provision specifically allowing them to enter into franchise agreements with cities, as well as adding PUDs to ORS 221.420 and ORS 221.450. Shaw was the attorney who represented St. Helens in the underlying litigation. He explained some of the background of the dispute to the committee as follows:

> "[U]nder the arrangement before this lawsuit \*\*\* both private utility companies that sell electricity and PUDs that sell electricity pay the same three and a half percent of gross revenue *franchise type of fee*, whatever you call it. And that amount as determined in a 1967 ruling by the PUC commissioner to decide what would be a fair amount.

> "And one city, I believe Portland, charges a five percent *licensing fee* and therefore, as a result of that, PUC commission has to consider the one and a half percent additional as a tax, and the three and a half percent is considered a *franchise fee*."

Tape Recording, House Committee on Environment and Energy, HB 3021, Apr 22, 1987, Tape 122, Side B (statement of Larry Shaw) (emphasis added).[15] Thus, although Shaw spoke to the committee at one point about franchises as negotiated agreements, he also appeared to draw no distinction, at least for purposes of describing the PUC's treatment of fees charged by cities to utilities, between franchise fees and licensing fees. That legislative history is, ultimately, not particularly helpful here, both because the legislature was not considering any nuanced difference between franchises and licenses at that point, and because it does not point

---

[15] The PUC order to which Shaw was referring may be what is currently codified at OAR 860-022-0040(1), (6). It provides that "all business or occupation taxes, license, franchise or operating permit fees, or other similar exactions" on certain utilities are allowed as operating expenses for rate-making purposes to the extent that they do not exceed 3.5 percent, and to the extent such fees exceed 3.5 percent "such excess amount shall be charged pro rata to energy customers within said city and shall be separately stated on the regular billings to such customers."

definitively toward a broader or narrower view of what the term "franchise" was meant to cover in ORS 221.450.

As the city urges and as the Court of Appeals held, the term "franchise" sometimes may carry an extremely broad meaning of any "special privileges" conferred by a government entity that do not belong to the citizens in general. *Northwest Natural Gas Co.*, 264 Or App at 44. Under that broad definition, a utility operating under a license might be said to have such a "special privilege." On the other hand, we believe that the weight of the authority cited above supports a conclusion that the term often is used more narrowly to describe negotiated agreements between a government entity and another entity, for their mutual advantage. 359 Or at 326 (quoting 2 *Bouvier's Law Dictionary* 1299, *Ballentine's Law Dictionary with Pronunciations* at 525). Such a negotiated agreement may take the form of a contract or an ordinance granting a franchise that, when accepted by the utility, essentially functions as a contract. *See, e.g.,* McQuillin, 12 *The Law of Municipal Corporations* § 34:5; *Newsom*, 94 Or at 202. Moreover, when the legislature originally enacted ORS 221.450, it used the word "franchise" alone in that statute, but in the two related statutes that were part of the same enactment, it used the phrases "grant, privilege or franchise," and "franchises, privileges or permits." Or Laws 1931, ch 234, §§ 2, 3. Had the legislature intended the word "franchise" to mean any "special privilege," as the Court of Appeals held, it seems unlikely that it would have felt the need to include the word "privilege" (or "grant" or "permit" for that matter) in the other subsections of the act. Additionally, as noted, in both of the cases in which this court has touched on the meaning of ORS 221.450, we have indicated that it concerns franchise *agreements*. *Rogue Valley Sewer Services*, 357 Or at 450; *US West Communications*, 336 Or at 183 n 1.

It appears that the statute was intended to encourage utilities to *negotiate* franchises with cities, or be penalized by having to pay a non-negotiated "privilege tax." The text read in context, as well as our case law, both point to the conclusion that the legislature, in using the term "without a franchise" in ORS 221.450, was referring to a negotiated franchise agreement. In sum, we conclude that the Court of

Appeals erred in reading "franchise" so broadly as to encompass the type of license fee established by GRC 6.30.110 and implemented by Gresham Resolution 3056.[16]

To summarize: (1) As to the meaning of "privilege tax" as used in ORS 221.450, we conclude that the "license fee" established by the City to raise revenues primarily to fund city-wide services such as police and fire departments, falls within the purview of a "privilege tax" as that term is generally used in municipal law and has specifically been used in Oregon law; (2) As to the meaning of "without a franchise" as used in ORS 221.450, we conclude that the legislature used the term "franchise" to describe a negotiated agreement between a utility and a city that functions as a contract. Neither the text of ORS 221.450 viewed in context or Oregon case law suggests that "franchise," as used in this context, should be read so broadly as to encompass a licensing scheme that involves the unilateral imposition of fees.

E.   *Preemption*

As noted, the issues presented also concern whether the City's authority to impose a seven percent privilege tax on the utilities in this case is preempted by the provisions of ORS 221.450. These issues implicate the home-rule provision of the Oregon Constitution. As we recently stated:

"Home rule is the authority granted to Oregon's cities by Article XI, section 2, and Article IV, section 1(5), of the Oregon Constitution—adopted by initiative petition in 1906—to regulate to the extent provided in their charters. Article XI, section 2, provides, in part, 'The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon[.]' In the same 1906 election, voters 'reserved' initiative and referendum powers 'to the qualified voters of each municipality and district as to all local, special and municipal legislation of

---

[16] We also note that, although it does not reflect on the legislature's intent in using the term "franchise" in ORS 221.450, the Gresham ordinances that underlie this dispute do not define a license and a franchise as the same thing. *See* GRC 6.30.030 (defining "franchise" as an ordinance or agreement granting al privilege to use a public right-of-way for "specific compensation" and defining "license" as an "ordinance or other document that grants permission for the licensee to use public rights-of-way for a specified purpose).

every character in or for their municipality or district.' Or Const, Art IV, § 1(5)."

*Rogue Valley Sewer Services*, 357 Or at 445. The purpose of the home-rule provision is to "allow the people of the locality to decide upon the organization of their government and the scope of its powers under its charter without having to obtain statutory authorization from the legislature." *LaGrande/Astoria v. PERB*, 281 Or 137, 142, 576 P2d 1204, *adh'd to on recons.,* 284 Or 173, 586 P2d 765 (1978). Municipal enactments, however, must be compatible with state law. To make that determination,

> "the first inquiry must be whether the local rule in truth is incompatible with the [state] legislative policy, either because both cannot operate concurrently or because the legislature meant its law to be exclusive. It is reasonable to interpret local enactments, if possible, to be intended to function consistently with state laws, and equally reasonable to assume that the legislature does not mean to displace local civil or administrative regulation of local conditions by statewide law unless that intention is apparent."

*LaGrande/Astoria*, 281 Or at 148-49. As for the latter determination, a statute will displace a local ordinance only "where the text, context, and legislative history of the statute '*unambiguously* expresses an intention to preclude local governments from regulating' in the same area as that governed by the statute." *Rogue Valley Sewer Services*, 357 Or at 450-51 (quoting *Gunderson, LLC v. City of Portland*, 352 Or 648, 663, 290 P3d 803 (2012) (emphasis in *Rogue Valley Sewer Services*)).

Because the analysis of the home rule question differs as to the private utilities and Rockwood PUD, we first set forth the general home rule analysis concerning ORS 221.450, then turn to Rockwood PUD's alternative argument that the license fee, to the extent that it exceeds five percent, is nonetheless an impermissible intergovernmental tax for which no statutory authority exists.

If ORS 221.450 was intended to have a preemptive effect on cities' imposition of "privilege taxes" in the form of license fees of this sort, then the utilities—and the trial court—would be correct that, to the extent that Resolution

3056 imposes such a fee in excess of five percent, it exceeds the City's home-rule authority and is invalid. *See LaGrande/ Astoria*, 281 Or at 148-49. We now turn to whether ORS 221.450 has such a preemptive effect. We reiterate the test as stated in *LaGrande/Astoria*: "The first inquiry must be whether the local rule in truth is incompatible with the [state] legislative policy, either because both cannot operate concurrently or because the legislature meant its law to be exclusive." *Id.* We must discern an unambiguous expression of legislative intent to preclude local legislation on the matter. *Rogue Valley Sewer Services*, 357 Or at 450-51.

As described above, both the comprehensive regulation of public utilities by state law and the ability of cities to adopt charters establishing their home-rule authority came about early in the last century in Oregon. Although there was a significant amount of litigation in that era concerning the respective authority of cities and the state to set the rates for public utilities, *see* 359 Or at 320-321, those cases do not provide definitive guidance as to the issue presented here; that is so because (1) the 1911 utilities legislation had specifically provided (in what is now ORS 221.420(2)) that cities had the ability to charge fees for a utility's use of the city's rights-of-way, thus removing that issue as a potential bone of contention; and (2) cities were generally understood not to have home-rule authority to enact taxes on the receipts of utilities unless specifically permitted to do so by the state legislature.

With that background in mind, we revisit the 1931 enactment of ORS 221.450. With respect to the home rule question, there would seem to be three possibilities concerning the original legislative intent of this statute. First, it might be—consistent with the utilities' view—that the legislature intended the statute to have a preemptive effect on otherwise-permissible municipal legislation, requiring a "floor" minimum five percent privilege tax. That interpretation is, frankly, so unlikely as to be unworkable with respect to the original 1931 enactment. As noted, the legislation "authorized" cities to leverage the privilege tax "in an amount of not less than 5 per cent annually." The use of the term "authorized" is inconsistent with the notion that the legislature was, instead, trying to enact a restriction rather

than an authorization. And while, in the abstract, it might be possible to theorize that the legislature was concerned that cities, having home-rule authority to charge privilege taxes, should be prevented from charging such taxes in amounts less than five percent, we can think of no feasible reason why it would do so.

Second, the legislature could have understood that home-rule cities already had authority to impose privilege taxes, but enacted the legislation in order to permit non-home-rule cities to do so, or to allow home-rule cities to do so even if their charters did not specifically grant them such authority. That view is, at least, consistent with the language of the enactment that the legislature was "authorizing" cities to do something they otherwise could not do. That view, however, is undermined by the broad language that "[t]he city council or other governing body of *every* incorporated city and town in Oregon hereby *is authorized*" to levy such privilege taxes. (Emphasis added.) The language of the enactment did not suggest that the legislature intended ORS 221.450 to apply to a subset of cities, depending on the nature of their charters, but intended to "authorize" a privilege tax that could be levied by "every" city.

The third possibility, and in our view the most plausible one in light of the textual difficulties with the prior two approaches and in light of the history described above, is that the 1931 legislature believed, given the early case law and its prior comprehensive legislation concerning regulation of utilities, that the legislature (but not the cities) had the ability to authorize cities' imposition of privilege taxes on utilities. In sum, the legislature did not consider what, if any, preemptive effect its enactment would have on cities' home-rule authority because it understood, based on the law as it existed at that time, that the cities' home-rule authority did not extend to the regulation of utilities. *See, e.g., Coates v. Marion County,* 96 Or 334, 339, 189 P 903 (1920) (presuming that, when a legislature enacts a statute, it does so "with full knowledge of the existing condition of the law and with reference to it.").

Little can be discerned about the 1933 amendment that changed the five percent from a "floor" to a "ceiling,"

other than that the change made the theory that the legislature intended to preempt local enactments somewhat more plausible. However, the statute continued to be framed in terms of an authorization rather than a restriction. We conclude that that authorization is not an unambiguous expression of an intent to "preclude local governments from regulating in the same area as that governed by the statute" *Rogue Valley Sewer Services*, 357 Or at 450-51.

We now return to the 1987 amendments to ORS 221.450, which, as noted, made substantive changes to the statute in order to address pending litigation concerning the ability of cities to collect fees from PUDs. As a preliminary matter, we note that it was the 1987 enactment that added ORS 221.415 to the context in which we evaluate ORS 221.450. Or Laws 1987, ch 245, § 1. In particular, we reiterate that, in ORS 221.415, the legislature "[r]ecogniz[ed] the independent basis of legislative authority granted to cities" in their charters, and intended its enactment, including the revisions to ORS 221.420 and ORS 221.450, "to *reaffirm* the authority of cities to regulate use of municipally owned rights of way[.]" (Emphasis added.) In ORS 221.415, then, we find the first explicit indication that the legislature may have viewed a city's ability to collect fees for the use of its rights-of-way as stemming from their municipal charters rather than from state law.

Again, as of 1987, this court's approach to home rule questions had changed significantly from what it had been in the early 1900s. That is, *LaGrande/Astoria* had laid out the modern preemption analysis and *Jarvill* had clarified the nature of cities' home-rule authority with respect to the imposition of taxes. We reiterate the context for the 1987 amendments as well: Although ORS 221.420 and 221.450 had remained virtually unchanged for half a century, the regulation of utilities had changed, and PUDs, which are a type of municipal corporation, had become more common. The specific issue that the legislature addressed in the 1987 legislation that amended ORS 221.450 did not concern privilege taxes, but rather concerned a broader question whether cities could charge any fees at all for PUD's use of rights-of-way. *See* 359 Or at 331-32 (describing litigation underlying

1987 statutory amendments); *Rogue Valley Sewer Services*, 357 Or at 452 (same).

  The 1987 legislation, which was introduced by Representative Bruce Hugo, was considered by the House Committee on Environment and Energy on April 22, 1987, when the committee held a public hearing and work session, and again in a work session on April 29, 1987. At the April 22 session, Representative Hugo told the committee that, although PUDs had been paying franchise-type fees to cities for many years pursuant to intergovernmental agreements, the trial court ruling in the St. Helens case called into question the abilities of cities to collect such fees and that in the wake of that ruling, numerous PUDs throughout the state had stopped paying such fees. Tape Recording, House Committee on Environment and Energy, HB 3021, Apr 22, 1987, Tape 122, Side B (statement of Rep. Hugo). Also during that hearing, Shaw explained to the committee that, although the litigation was ongoing—apparently an appeal of the circuit court decision was pending—the legislature should not await the outcome of the litigation because the amount of revenue at stake for the cities was significant. *Id.* (statement of Larry Shaw). There was some discussion as to whether, or to what extent, such legislation should be retroactive. Shaw opined that, "if you took out retroactivity, the, this bill would only affect prospective payment and the lawsuit would affect the home rule issues and the—and the retroactive payment, and it may or may not be settled by this bill." *Id.* A representative for the Oregon People's Utility District Association opposed the bill, stating that it was an "attempt to intervene in the orderly process of the court and would have the legislature preempt the Court of Appeals." Tape Recording, House Committee on Environment and Energy, HB 3021, Apr 22, 1987, Tape 123, Side B(statement of Marion Hemphill). A representative from the League of Oregon Cities indicated that the bill would "reaffirm" the ability of the cities to charge fees for the use of rights-of-way. *Id.* (statement of Phillip Fell). And finally, a representative of Oregon Rural Electric Cooperative Association, (electrical cooperatives were included along with PUDs in the proposed amendments) indicated that the cooperatives did not oppose the bill, adding that because "the bill does not propose to

increase the maximum allowable tax rate, ORECA sees no substantive change to the way we do business." *Id.* (statement of Sara Baker-Sifford). To summarize, some suggested that enacting the legislation might not affect the pursuit of the lawsuit concerning the "home rule" question, whereas others suggested it would effectively "preempt" the ongoing litigation. The witnesses also had varying opinions as to the extent the legislation "reaffirmed" cities' pre-existing rights. And at least one witness, Baker-Sifford, believed that some pre-existing law (it is unclear whether she was referring to ORS 221.450) governed the maximum rate that a city could charge for use of its rights-of-way and that the proposed legislation did not affect that law.

In the subsequent work session on the bill, as the committee was amending the draft legislation to remove proposed retroactivity provisions, Representative Ron Eachus asked what effect the legislation would have on the pending litigation. Mr. Hemphill, on behalf of the Oregon PUD Association, indicated that there had been discussions that the appeal would be dismissed if the bill were to be enacted, but Mr. Shaw, on behalf of St. Helens, indicated that, although the appeal would have been mooted by retroactive legislation, it was not clear that the bill as then drafted would do so. Tape Recording, House Committee on Environment and Energy, HB 3021, Apr 29, 1987, Tape 138, Side A. The following exchange then took place:

"REP EACHUS:   If the bill passed without the retroactive, it would still clarify the question of—clarify part of the question. It would make it permissive. It would be clear that you could do this.

"REP HUGO:   Right.

"REP EACHUS:   You're not prohibited from it. Doesn't say you have to do it, but you can do it.

   "Question then that remains is status of the current lawsuit. *** If the bill passes, if the lawsuit is pursued, is there anything else that lawsuit would affect, other than the retroactive nature?"

Shaw indicated that the lawsuit "could be a landmark home rule case if it's carried forward," and went on

to discuss some of the details of the underlying case that would need to be addressed in any negotiated settlement. *Id.* Representative Eachus then asked whether, if "you get a final determination on the lawsuit, does the lawsuit then have any effect on the impact of the legislation? Is there any [issue] in the lawsuit that would, if it is finally decided, set up a situation different than what we had anticipated when we passed this bill?" *Id.* Shaw indicated that it would not, and Hemphill opined that the case would be mooted. *Id.* A discussion ensued:

> "REP HUGO:   The home rule issue says that a city has the right to levy a franchise fee. This bill says that the city or the governing body may levy or collect. So if the cities want to go ahead and pursue the home rule thing, they've just left this track and gone on another spur. They're on something a little, quite a bit, bigger. What this simply says is that the cities may levy a fee.

> "REP EACHUS:   Well, I guess that's what I'm trying to figure out, is if we say they may, and then the court case that says they have a right to, is there a difference?

> "REP HUGO:   Absolutely.

> "REP EACHUS:   And does that mean that the court case has gone further, much further, than we did here, which is why if the purpose of this bill is to, is to really settle the issue and be permissive, and we don't drop the lawsuit, then, then we're saying that, I'm not sure that that's what we want to do. What we would be saying is it may. If we agree it's may, and were going to leave it up to the court to decide whether it's more than may. And—

> "REP HUGO:  I think that's correct, Representative Eachus. What my intention was it to clarify a city does have the right, under this language, may levy, and that's as far as I wanted to go with it. If they want to pursue the same in court on a home rule issue that says the city has the right to, that's up to them. But I think that issue stands aside from this bill. The home rule issue is a little broader."

*Id.*

We find nothing in the text of ORS 221.450 as amended in 1987, nor in the context (particularly the enactment of ORS 221.415 acknowledging cities' home-rule

authority with respect to its rights-of-way), nor in the legislative history, that demonstrates an unambiguous expression of legislative intent to preclude local legislation with respect to charges for use of rights-of-way. *Accord Rogue Valley Sewer Services*, 357 Or at 453 (declining to view legislative history of the 1987 amendments to ORS 221.420 and ORS 221.450 as establishing by "negative implication" that a city could not impose a fee not specifically authorized by those statutes). Rather, to the extent that the legislature considered the matter at all—and we acknowledge that little, if any, of the above-quoted legislative history related to privilege taxes under ORS 221.450, as most of the focus was on franchise fees—we have the words of the bill's sponsor that he did not intend the legislation to have any impact on the home-rule issue presented in the underlying litigation.[17]

To summarize: The home-rule provisions of the Oregon Constitution were adopted in 1906, and very shortly thereafter—in 1911—the legislature enacted comprehensive regulation of utilities. That 1911 legislation, although removing utility rate-setting from the purview of cities, specifically allowed cities to require "payment of charges and fees" from utilities for the use of city rights-of-way. Or Laws 1911, ch 279, § 61(1). In 1931, the legislature added a provision authorizing a city to levy a privilege tax on a utility for the use of its public rights-of-way if the utility was operating in the cities without a franchise (now codified at ORS 221.450). Or Laws 1931, ch 234, § 1. And in 1987, the legislature, when amending ORS 221.450, "[r]ecogniz[ed] the independent basis of legislative authority granted by cities in this state by municipal charters, *** [and] reaffirm[ed] the authority of cities to regulate use of municipally owned rights of way[.]" Or Laws 1987, ch 245, § 1.

We return now to the test from *LaGrande/Astoria* concerning preemption: "whether the local rule in truth is incompatible with the legislative policy, either because both cannot operate concurrently or because the legislature

_____

[17] It is unclear what ultimately happened with respect to the litigation that prompted the 1987 amendments, although no appeal ultimately was pursued. We note, however, that the home-rule issue presented in that case was in many respects quite similar to the issue this court recently decided in *Rogue Valley Sewer Services*.

meant its law to be exclusive." 281 Or at 148-49. The utilities argue, and the trial court agreed, that the imposition of a seven percent privilege tax for use of the City's public rights-of-way is incompatible with legislative policy because it cannot operate concurrently with the five percent privilege tax authorized by ORS 221.450. The difficulty with the utilities' argument is that it premised on an assumption that ORS 221.450 acts as a general limitation on a city's authority, rather than a grant of limited authority.

The legislature's apparent intent in enacting this statute in 1931, and more clearly its intent in 1987 when it amended the statute, was to ensure that cities had authority to deal with recompense for utilities' use of cities' rights-of-way on a local level. There is no indication that the legislature intended to circumscribe cities' authority. The statute is an authorization, not a restriction: The fact that the privilege tax authorized by the statute cannot exceed five percent does not necessarily mean that a privilege tax levied pursuant to other authority—such as a city's home-rule authority—is subject to the same limitation. To be sure, the five percent limitation can be viewed as a restriction, but it is a restriction that applies to what is authorized by the statute. Whether it should be interpreted to be a broader restriction that also would serve to preempt local legislation based on a different source of authority is a question of legislative intent. And, as discussed above, we have been unable to discern any basis for concluding that the legislature had any such intent to preempt. To interpret the statute as a restriction on a city's home-rule authority would require us to ignore the very reason for the statute's existence.

In *LaGrande/Astoria,* this court drew a distinction between laws that concerned the structure and procedure of municipalities, noting that such must be justified by a need "to safeguard the interests of person or entities affected by the procedures of local government." In contrast, a state law that embodies substantive social, economic, or regulatory objectives will

"prevail over contrary policies preferred by some local governments if it is clearly intended to do so, unless the law

is shown to be irreconcilable with the local community's freedom to choose its own political form. In that case, such a state law must yield to those particulars necessary to preserve that freedom of local organization."

*Id.* at 156. It is not disputed that regulation of public utilities is a legitimate, substantive regulatory objective that is properly a subject of state law (and the City does not argue otherwise). As explained above, however, the intent of the legislature in enacting ORS 221.450, insofar as we have been able to determine, was not to provide either a substantive regulation of utility services or a limitation on cities' ability to charge for use of rights-of-way on a state-wide level, but to ensure that municipalities had the ability to be compensated, at least at some minimal level, when such utilities used the cities' public rights-of-way.

A local enactment such as the Gresham resolution at issue here is not incompatible or in conflict with the legislative policy embodied in ORS 221.450. The City had a legitimate local concern—the funding of its fire and police departments—that it chose to meet by enacting a resolution that increased the license fee paid by utilities to use its rights-of-way. Moreover, the primary impact of that local enactment is, as *amici* have noted, *see* 359 Or at 315, that the increased license fees, while collected by the utilities, can simply be passed on by the utilities to the citizens of Gresham that use those utilities' services. It is a local enactment addressing a local concern, with a local impact. Thus, it is precisely the type of enactment that historically has come within a city's home-rule authority.

In sum, the legislature intended to ensure that municipalities could be compensated for use of their rights-of-way, initially by recognizing their abilities to charge fees for the use of rights-of-way and later by authorizing a privilege tax. However, the statute authorizing the privilege tax is not, under the test from *LaGrande/Astoria,* necessarily "incompatible" with a local enactment establishing a different rate. And indeed, not only is there no indication that the "legislature meant its law to be exclusive," 281 Or at 149, but the text of ORS 221.415 recognizing the independent basis of the "authority of cities to regulate use of municipally owned

rights of way," and the legislative history of the 1987 amendments quoted above, indicate that the legislature did not, in fact, intend its law to be exclusive. We reiterate, when ORS 221.450 was originally enacted and amended in the 1930s, the legislature did not unambiguously express an intent to displace local legislation because it had no cause to consider that issue: the law at that point strongly suggested that matters concerning regulation of utilities was a subject of state, not local, regulation. That is, the legislature believed it was conferring on cities the authority to impose privilege taxes in a particular situation, but it does not follow that in doing so, the legislature was attempting to impose a restriction on cities that otherwise would not have existed. Moreover, the enactment of ORS 221.415, and the legislative history cited above, indicate that the legislature *did* recognize that cities at least arguably had home-rule authority to enact local legislation concerning municipal rights-of-way and did not intend to restrict it.

Given the text, context, and legislative history of ORS 221.450, we are unable to conclude that the legislature intended its enactment to be the exclusive means by which a city could charge privilege taxes or license fees to utilities using its rights-of-way.[18] That conclusion disposes of the arguments offered by the private utilities as to the validity of the Gresham ordinances. The trial court erred in concluding that ORS 221.450 has a preemptive effect on those ordinances as they applied to the private utilities.

F.   *Intergovernmental Taxation*

Rockwood PUD argues, as did the plaintiff in *Rogue Valley Sewer Services*, that as a general matter, a municipality such as a city lacks authority to tax another municipality

---

[18] We acknowledge that there is some broad language in *Rogue Valley Sewer Services* that could be read to suggest otherwise. In that case, we stated:

"[T]he legislature has provided a framework for cities to collect a franchise fee from utilities, both public and private, operating within their rights-of-way. *See* ORS 221.420; ORS 221.450. Where cities and utilities have not entered into an agreement for a different fee arrangement, the legislature provides for a five percent fee. ORS 221.450."

357 Or at 450. That statement, while accurate, should not be understood to mean that those statutes are the sole authority for a city's collection of a privilege tax from private utilities for their use of rights-of-way.

such as a PUD, in the absence of express statutory authority to do so. Rockwood PUD acknowledges that ORS 221.450 provides express statutory authority to collect a privilege tax for use of the city streets, but asserts that such a tax cannot exceed the five percent limitation found in that statute. Thus, it argues, the Gresham resolution at issue in this case, that raised a privilege tax for use of city streets from five to seven percent, was an impermissible intergovernmental tax. As explained below, we agree.

As did the plaintiffs in *Rogue Valley Sewer Services*, Rockwood PUD relies primarily on our holdings in three cases: *Cent. Lincoln P.U.D. v. State Tax Com.*, 221 Or 398, 351 P2d 694 (1960); *Portland v. Multnomah County*, 135 Or 469, 296 P 48 (1931); and *Portland v. Welch et al.*, 126 Or 293, 269 P 868 (1928). We discussed those cases in *Rogue Valley Sewer Services,* observing that "'[t]he intention to tax a municipality is not to be inferred, but must be clearly manifested by an affirmative legislative declaration.'" 357 Or at 466 (quoting *Cent. Lincoln P.U.D.*, 221 Or at 406). The rationale for limiting the ability of the state to tax another governmental entity was explained in *Portland v. Multnomah County*, 135 Or at 472: "It would be analogous to taking money out of one pocket and putting it into another." *See also id.* at 471 ("It is clear that the state, in the exercise of its sovereign power, may tax property belonging to it or to any of the subordinate branches of the government, but, unless there is a clear legislative declaration of its intention so to do, such property is not taxable."); *Portland v. Welch*, 126 Or at 293 ("Under our system of taxation, public revenues are derived from the taxation of property privately owned and, in the absence of an express legislative declaration to that effect, it is unreasonable to suppose that the legislature intended that property belonging to the public should be taxed. No benefit to the public could arise from such taxation.").

We rejected the plaintiff's argument in *Rogue Valley Sewer Services* that the fee at issue in that case ran afoul of that general rule because we concluded that the fee at issue was not, in fact, an intergovernmental tax. We distinguished between a "tax" and a "fee" based on whether

the "charge is expended for general public purposes, or used for the regulation or benefit of the parties upon whom the assessment is imposed." *Rogue Valley Sewer Services,* 357 Or at 447, quoting *McCann v. Rosenblum*, 355 Or 256, 261-62, 323 P3d 955 (2014). We concluded:

> "A fee, then, is imposed on particular parties and is used to regulate or benefit those parties rather than being used for general public purposes or to raise revenue for such purposes. In this case, the ordinance applies to one particular party only, RVS, and the ordinance directs that the city will 'allocate money collected from RVS only for costs and reimbursement connected with proper regulatory purposes.' The money collected from the franchise fee is to be used to cover 'the full costs and full impacts associated with [RVS's] use, occupation, and other activities' in the city's rights-of-way, including 'the additional oversight and associated costs incurred from City administration, maintenance and repair of City-owned facilities within City right-of-ways, special services performed by the City, and office and field-related costs.'"

*Rogue Valley Sewer Services*, 357 Or at 447. Here, by contrast, although the challenged "license fee" is labeled a "fee" rather than a tax, it differs from the fee at issue in *Rogue Valley Sewer Services* because rather than being assessed to cover the costs associated with Rockwood PUD's use of the City's streets, it is to be "expended for general public purposes." *Id.* The "license fee" in this case could be allocated pursuant to GRC 6.30.110 "to specific funds, projects or programs of the city," which conceivably could qualify as either taxes or fees, depending on the circumstances. However, Resolution 3056, which increased the license fee authorized by GRC 6.30110(1)(a) from five to seven percent, specified that the revenues generated would be used to fund "core city-wide services such as Police, Fire and Parks," and that a smaller portion would be used for streetlights. We thus conclude that the license fee at issue here, as authorized by Resolution 3056, constitutes a "tax" rather than a "fee," in light of its primary purpose to fund core city-wide services such as police, park and fire services.

       The City does not challenge Rockwood PUD's assertion of a general rule of law requiring explicit legislative

authority for intergovernmental taxation, but instead argues that there is, in fact, statutory authority for its assessment of the tax on Rockwood PUD.[19] In particular, it cites ORS 221.415, enacted in 1987 (as described above) and ORS 261.305, relating to PUDs, which was amended at the same time that ORS 221.415 was enacted. The City posits that ORS 221.415, by "reaffirming" cities' home-rule authority with respect to regulation of its rights-of-way, provided an express legislative declaration of intention to allow imposition of intergovernmental taxes. We disagree. ORS 221.415 does not grant express statutory authority to impose an intergovernmental tax. The most that it does is reaffirm whatever home rule authority a city has and, in this case, as noted, we do not reach issues that have not been adequately briefed concerning whether a City's home rule authority could extend to the imposition of such a tax. *See* 359 Or at 349 n 19. Nor does the text of ORS 261.305, as amended by the 1987 legislature, express a clear legislative intent to permit intergovernmental taxation of PUDs by cities. Rather, that statute, which sets forth the various powers of PUDs, was amended to specify that PUDs had the authority to enter into franchise agreements, intergovernmental agreements and contracts with cities and to pay fees under such agreements. Or Laws 1987, ch 247, § 4. ORS 261.305 says nothing about taxation. Rather, the only provision in the 1987 legislation that pertained to a city's ability to impose a tax on a PUD was ORS 221.450. Thus, in one respect, the City is correct that the 1987 legislation provided express authority for it to impose a "privilege tax"

---

[19] The City also asserts in its brief that it is incorporating by reference arguments made in portions of briefs filed by the City of Phoenix and *amicus curiae* in *Rogue Valley Sewer Services. But see* ORAP 5.77 ("A party may join or adopt a brief submitted in the same case or consolidated case but shall not join or adopt a brief in another case."). Some of those arguments were addressed by this court in *Rogue Valley Sewer Services* but, as explained above, our decision in that case does not aid the City here because of the differences between the "fee" in that case and the "tax" in this one. Because the City neither describes other arguments briefed in *Rogue Valley Sewer Services* nor attempts to explain how they might apply in the present case, we conclude that those arguments are not properly before the court in this case. *See PGE v. Ebasco Services, Inc.*, 353 Or 849, 857 n 7, 306 P3d 628 (2013) (where brief made only passing reference to issue, and did not develop any argument on it, the court declined to consider it). Thus, we do not address broader issues concerning how home-rule authority might interact with the principles enunciated in the intergovernmental taxation cases.

on a PUD. However, that express authority was embodied in ORS 221.450, which contains an explicit limitation on the amount of the privilege tax that could be assessed—"an amount not exceeding five percent of the gross revenues of the [PUD] currently earned within the boundary of the city." In sum, we conclude that there is no statutory authority for imposition of a "privilege tax" by the city on a PUD in excess of the amount expressly authorized by ORS 221.450. Accordingly, Resolution 3056, which increased the "license fee" authorized by GRC 6.30110(1)(a) from five to seven percent, as applied to Rockwood PUD, exceeded by two percent the amount that a city could levy as a privilege tax against a PUD pursuant to ORS 221.450.

### III.   CONCLUSION

By enacting ORS 221.450, the legislature authorized cities to impose privilege taxes on utilities operating without a franchise for use of city rights-of-way, but in doing so, the legislature did not unambiguously express an intent to preempt cities from enacting license fees for the use of rights-of-way—even license fees that fall within the definition of "privilege tax." We therefore conclude that the City of Gresham's license fee ordinance and resolution were, as a general matter, within its home-rule authority. However, because the "privilege tax" also constituted an "intergovernmental tax" with respect to Rockwood PUD,  and the City relies on ORS 221.450 as express statutory authority for that tax, the City's resolution was invalid as to Rockwood PUD because it did not comport with the five-percent limitation specified in that statute.

The judgment of the Court of Appeals is affirmed in part and reversed in part. The judgment of the circuit court is reversed in part and remanded for entry of judgment in favor of Rockwood PUD.